**Elaine WHITTENBERG, et al., Plaintiffs,**

**Mr. and Mrs. James P. Harrison, et al., NAACP, Individually and on Behalf of Persons Similarly Situated, Dr. and Mrs. William T. Weathers, et al., Martha H. Drew, et al., Intervenors,**

v.

**The SCHOOL DISTRICT OF GREENVILLE COUNTY, SOUTH CAROLINA, et al., Defendants.**

**Civ. A. No. 63–4396–3.**

United States District Court, D. South Carolina, Greenville Division.

March 11, 1985.

William F. Robertson, III, Greenville, S.C., for 6/5/84 intervenors, plaintiffs.

Merl F. Code, Jeff Weston, Greenville, S.C., for 6/13/84 intervenors, plaintiffs.

William M. Grant, Jr., Haynsworth Law Firm, Greenville, S.C., for 10/5/84 intervenors, plaintiffs.

Ronald C. Friddle, Donald L. Pilzer, Greenville, S.C., for 2/20/85 intervenors, plaintiffs.

Vance B. Drawdy, J. Wright Horton, Horton, Drawdy, Ward & Johnson, James C. Parham, Jr., Wyche, Burgess, Freeman & Parham, Greenville, S.C., for defendants.

### ORDER

GEORGE ROSS ANDERSON, JR., District Judge.

This matter arises out of petitions to intervene in the original action filed in this Court on August 19, 1963, seeking to desegregate the school system of Greenville County, *Elaine Whittenberg, etc., v. School District of Greenville County, South Carolina, et al.* Four groups of persons have filed petitions to intervene: Mr. and Mrs. James P. Harrison, *et al.*, the Concerned Parents of Greenville High School (Greenville High group); NAACP, *et al.* (NAACP); Dr. and Mrs. William T. Weathers, *et al.*, parents of students at various high schools, including Wade Hampton High School and Eastside High School (Wade Hampton High and Eastside High group); and Martha H. Drew, *et al.*, members of Concerned Parents and Friends of Parker High School (Parker High group). The defendants are the School District of Greenville County and related parties ("School District").

During the almost twenty-two years since the commencement of this action, numerous Orders have been entered by the Court; most significant among these are the Order of Judge J. Robert Martin, Jr., filed on February 5, 1970, and the Order of Judge Robert F. Chapman filed on July 22, 1976.

The Order of Judge Martin on February 5, 1970, approved a plan of integration proposed by the School District of Greenville County which assigned students and teachers to schools throughout the system on a ratio of approximately 80% White to 20% Black, reflecting the racial makeup at that time of both students and teachers. This plan of integration was submitted to the Court by the School District in late 1969, with the request for authority to implement it in September of 1970. This Court approved the plan and schedule. The plaintiffs, however, demanded immediate implementation and appealed to the United States Court of Appeals for the Fourth Circuit on the question of the schedule only. The Court of Appeals, on the basis of decisions of the United States Supreme Court in *Alexander v. Holmes County Bd. of Educ.*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and *Carter v. West Feliciana Parish School Bd.*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970), in an opinion filed January 20, 1970, reversed Judge Martin's Order and required implementation of the plan by February 9, 1970, or February 16, 1970, for good cause shown. On remand, Judge Martin granted the one-week extension.

During the ensuing eleven (11) days, the School District complied with the Order of this Court and integrated 58,000 students and 2,384 faculty members throughout the 103 schools in the District on a ratio approximating 80% White to 20% Black in every school. The School District covers approximately 800 square miles and, at that time, was the seventieth (70th) largest of the approximately 16,000 school districts in the United States. The promptness and thoroughness with which this original plan of complete integration was implemented in one of the largest school districts in the United States is a striking example of the School District's good faith and of its professional and statesman-like response to the requirements of the United States Constitution. In Judge Martin's Order, the Court retained jurisdiction in this case for purposes of hearing any aggrieved party to this action who might seek relief on legal or constitutional questions.

In July of 1976, the School District petitioned the Court to change the requirements of Judge Martin's Order from target racial ratios of 80% White and 20% Black to

target racial ratios of 76% White and 24% Black, because the ratios in the student population had so changed. The School District also sought approval of a plan for the following school year, 1976–77, which limited student reassignments to grades 1, 6 and 9 and avoided the necessity to reassign students in every grade to achieve the proper racial balance. Under the existing system, it was possible that a student could be assigned every year to achieve the required racial balances. Judge Chapman held a hearing on July 15, 1976, at which he received testimony and evidence from the School District. The intervenors submitted no evidence. By his Order dated July 22, 1976, Judge Chapman found that, as to student assignment, the School District has been operated as a unitary system, and he approved the School District's assignment plan for 1976–77. The Order imposed no restrictions on the School District after the 1976–77 school year, beyond the requirement that the School District remain unitary. The Order held open the question of teachers and other professional employees, which had been raised by motion of the intervening plaintiffs.

Some eight years later, the current intervenors have raised the following issues:

The Greenville High group filed the first petition for intervention in this case, on June 5, 1984. These intervenors, parents of children who attend Greenville High School, allege that the School District has failed to abide by the Court's prior orders in failing to maintain racial balances, that course offerings and facilities were inferior at Greenville High School, and that the School District has failed to operate as a unitary system.

The NAACP filed the second petition for intervention in this action on June 13, 1984. This petition is quite lengthy and makes numerous allegations, including, *inter alia:* that the School District closed Black schools while building new schools and expanding existing schools in White neighborhoods in violation of the Fourteenth Amendment; that the burden of busing was borne disproportionately by Blacks;

that the School District has violated the 1976 Order of Judge Chapman by relaxing racial balances; that the District has allowed certain schools in predominately Black neighborhoods to become under-enrolled with a resulting disadvantage in funding; that the School District has discriminated against Black students in educational opportunities; that the School District has discriminated on the basis of race with respect to faculty, administrators, and other personnel in hiring and promotion; that the School District has discriminated against Black students and other personnel in discipline; and that the School District has failed to establish and maintain a unitary school system as required by the Constitution of the United States.

On October 5, 1984, the Wade Hampton High and Eastside High Group filed the third petition to intervene, making no specific allegations, but stating that they sought intervention to protect their interests in the proceeding, which they alleged were different from those of the other intervenors.

Finally, on January 31, 1985, the Concerned Parents and Friends of Parker High School (Parker High Group) filed the fourth and last petition to intervene in this action. They submitted a "Complaint" to the Court, alleging: that Parker High School is a well-integrated school; that the School District planned to convert Parker High School to a middle school; that the School District has based its decision to change the use of Parker High on mistaken or inadequate reasons; and that the School District was improperly planning to close a "well-integrated high school".

Hearings have been held in this matter on July 6, 1984; July 13, 1984; October 23, 1984; November 7, 1984; January 21, 1985; and February 12, 1985. As a result of these hearings, the Court granted the motions to intervene.

Orders were also issued requiring the School District to prepare and file with the Court a student assignment plan which would properly reflect the following factors: utilization of the existing physical

facilities; minimization of busing to achieve acceptable racial balance in the school system; minimization of dislocation of students; and costs. The School District was also instructed to conduct public hearings on the plan and to submit progress reports to the Court and to the attorneys for all parties on December 1, 1984; January 2, 1985; and January 15, 1985.

At the beginning of these proceedings the School District hired a consulting firm, Ketron, Inc., to prepare a study and student assignment plan with the assistance of a computer. At the November 7, 1984, hearing, the School District advised the Court that the consultant, Ketron, Inc., had been unable to provide a suitable plan, and that the Board of Trustees of the School District had instructed the School District staff to begin immediately to prepare a plan to submit to the Court.

The School District timely filed its Progress Reports on the dates required. In the second Progress Report, filed on December 31, 1984, the School District included the "Student Assignment Study, A Report to the Board of Trustees," dated December, 1984, in which nineteen (19) alternative draft plans for student assignment were set forth. Of these plans, the School District staff recommended EL3 (for elementary schools), MS3 (for middle schools), and HS3 (for high schools), collectively referred to as "Plan 3". This is the plan which was finally adopted, with certain modifications, by the Board of Trustees of the School District and submitted to the Court. Prior to presenting the Student Assignment Study to the Board of Trustees with its recommendation, the committee of the School District staff responsible for preparation of the proposed plan met with representatives of the intervenors on December 3, 10, and 14, 1984, to receive their suggestions.

At a meeting held on December 20, 1984, the Board formally accepted the report and the staff's recommendation of Plan 3, and scheduled a meeting on January 10, 1985, for public comment and final action by the Board. Between December 20th and January 10th, all nineteen (19) draft plans, including Plan 3 with accompanying maps, were made available for public inspection at the School District offices as follows:

| | | |
|---|---|---|
| December 27, 1984 | - | 11:00 a.m. to 2:00 p.m. |
| December 28, 1984 | - | 11:00 a.m. to 2:00 p.m. |
| January 2, 1985 | - | 11:00 a.m. to 2:00 p.m. |
| January 3, 1985 | - | 11:00 a.m. to 2:00 p.m. |
| | | 6:00 p.m. to 8:00 p.m. |
| January 4, 1985 | - | 11:00 a.m. to 2:00 p.m. |
| January 7, 1985 | - | 11:00 a.m. to 2:00 p.m. |
| | | 6:00 p.m. to 8:00 p.m. |
| January 8, 1985 | - | 11:00 a.m. to 2:00 p.m. |
| January 9, 1985 | - | 11:00 a.m. to 2:00 p.m. |

At each of these sessions, staff members were present to provide information and answer questions.

Immediately prior to the meeting held on January 10, 1985, the Board of Trustees met with the Greenville County Legislative Delegation to answer questions regarding the proposed plan. At the public meeting, the Board conducted a two-hour hearing of public comment on the plan, after which, by a vote of 10 to 1, they adopted Plan 3 with three (3) amendments.

At a meeting held on February 12, 1985, another extended session of public comment was held, and the Board received a number of requests for additional changes in Plan 3. On February 21, 1985, the Board adopted final changes to Plan 3. At this same meeting the Board also adopted the following resolution:

1—Except for adjustments required to correct actual mistakes in assignments, or slight changes required in fine tuning, the Board of Trustees will make no further changes in Plan 3, as amended, which would have a negative impact on utilization of school buildings or racial balances;

2—Every high school in the School District of Greenville County shall have the essential curriculum regardless of the number of students enrolled, and every student in each high school shall have access to any desired course(s) offered at any of the other high schools; this commitment is subject only to the availability of revenues suf-

ficient to satisfy the deficit projected to be 2.3 million dollars;

3—For the school year 1986–87, the Board of Trustees commits to maintaining enrollments in all high schools in the District at a minimum of 1,000 students with the exception of Blue Ridge High School which is located in a remote part of the County; and,

4—The Board of Trustees will insure that the program at no elementary school will suffer by reason of enrollment of less than 300 students; and the Board will give its serious attention to increasing the enrollment and maintaining a proper neighborhood for Blythe Elementary School.

The trial of this matter was commenced on March 4, 1985, and completed in one day. (This Court had designated the period of March 4 through March 8, 1985, for this trial, and earlier estimates by counsel of total trial time had been from one to two weeks.) On the Court's instructions, the School District opened the proceedings, and the intervenors followed. The School District presented testimony by Mr. Rudolph G. Gordon, Area Assistant Superintendent and Chairman of the School District's Student Assignment Committee, and Dr. Thomas E. Kerns, Interim Superintendent of the School District. Mr. Gordon and Dr. Kerns are Black. The School District's Student Assignment Committee, of which Mr. Gordon is Chairman, prepared the "Student Assignment Study" which included the recommended Plan 3. Mr. Gordon, whose qualifications as a public school administrator were conceded by the intervenors, has served in numerous capacities during his sixteen (16) years with the District. His resume is filed as Defendants' Exhibit 11A. Mr. Gordon testified at length concerning the provisions and impact of Plan 3. This testimony indicated improvements in all areas included within the guidelines by which the Plan was developed.

### Utilization of Facilities

Under the Plan, the fifty-four (54) elementary schools with 18,917 students show an increase in average facility utilization from 82% to 83%. It is difficult to demonstrate an overall significant increase in utilization in the elementary schools because of the large number of unused seats, approximately 4,000, at this level. If changes of at least 5% are measured, however, a positive impact is demonstrated for twenty-one (21) schools, and a negative impact occurs in thirteen (13) schools; nine (9) of these thirteen (13), however, have portable classrooms.

At the middle school level, with fifteen (15) schools and 12,590 students, the average facility utilization is increased from 89% to 92% under the Plan. A positive impact is demonstrated for five (5) schools, and a negative impact occurred in two (2) schools, Northwood and Northwest, both of which have portables.

The fourteen (14) high schools with 15,098 students show an increase in average facility utilization from 88% to 94% under the Plan. Seven (7) of these schools were affected positively and two (2) negatively; these latter two (2), Riverside and Mauldin, have portables. Mr. Gordon stated that, because of the large number of school buildings and extra seats in the District, proper utilization of facilities requires the closing of some schools. The Plan requires the closing of three (3) schools and the conversion of five (5) others. (See Defendants' Exhibits 12B and 12H–Q)

### Racial Ratios

One goal of the Plan is to maintain healthy racial balances throughout the system to the extent possible without undermining other criteria upon which the Plan is based. Target ratios for Black students are: 28% at the elementary level, 25% at the middle school level, and 23% at the high school level with an allowable variance in each case of plus or minus 15%. Thus, the maximum target ratios for Blacks would be 43% for elementary schools, 40% for middle schools, and 38% for high schools.

Racial balances throughout the School District have been maintained to a remark-

able degree since Judge Martin's Order in 1970. (See Defendants' Exhibit 2B).

The projected enrollment under Plan 3 would improve these balances even further. Although the target ratios are not met in some schools, the overall effect is quite positive. At the elementary level, if each school is evaluated as to whether the new racial balance is either above or below the target limits and negative points are given in either case, elementary schools still show a net positive impact. This is also the case at the middle school and high school levels. If only the maximum target ratio for Black students is considered, only one (1) elementary school, Sirrine, with 49%, and one (1) high school, Southside, with 51%, fall outside the target limits. Thus, two (2) schools out of eighty-three (83), or 2.4%, would fall outside of the target ratios. The racial balances provided for in Plan 3 go far beyond the requirements of the law. (See Defendants' Exhibits 2B and 12C). There are no schools in the School District which even approach an all Black student body.

### Neighborhood Concept

The Plan promotes neighborhood integrity by the use of assignment units called geocodes. Geocodes comprise, on the average, approximately 200 census blocks and have been assembled in an attempt to preserve natural neighborhoods. All students at a given grade range who reside in a given geocode are assigned to the same school. This is an improvement over the current system under which Black and White students from the same census block, and perhaps the same street, were assigned to different schools. (See Defendants' Exhibit 12D).

### Busing

The Plan results in a reduction of long distance busing (over four (4) miles) for Black students at all levels. The number of White students bused over four (4) miles is decreased at the elementary level, but increased at the middle and high school levels. The overall slight increase in the total number of students bused any distance (2%) is to be expected as a result of school closings described below. Information is not yet available on the precise effects of the Plan on busing for racial balance. This compilation requires from four (4) to six (6) weeks after an assignment plan is completed and involves tedious manual compilations. A positive effect in this area can be projected, however, in light of the use of the geocode assignment units which reduce the number of "islands" bused out of one neighborhood to attend a school in another neighborhood. (See Defendants' Exhibit 12E).

### Dislocation

Students reassigned under the Plan to a school different from that now attended fall into three categories:

| | | |
|---|---|---|
| School Closings and Conversions | - | 1,990 |
| Special Permission | - | 1,498 |
| Intact Assignment Units (Neighborhood Geocode) | - | 4,670 |
| | | 8,158 |

The dislocations caused by school closings and conversions will not be required in subsequent years. Special permission reassignments merely return students to schools from which they had obtained special permission transfers. The reassignments required to assemble the geocodes will not be required in subsequent years. Some of the above categories will overlap, resulting in a reduction of total dislocations. Mr. Gordon estimated that the dislocations caused to achieve the racial balance targets would involve approximately 1,000 students. He also pointed out that the "status quo" approach under the Plan, whereby geocodes are assigned to the school now attended by a majority of the students residing in the geocode, will minimize dislocation. (See Defendants' Exhibit 12F).

### Cost and Program

The estimated annual savings in operating cost from the school closings and conversions under the Plan is $717,500. This

is a conservative estimate and does not include any projected savings in capital expenditures. The School District is projecting a deficit for next year in the amount of $2,300,000. Mr. Gordon expressed the hope that savings from closings and conversions could be directed toward school program.

The School District also called as a witness, Dr. Thomas E. Kerns, Interim Superintendent since August of 1984. Dr. Kerns has been with the School District for some twenty nine (29) years and has held numerous positions in the system. (See Resume, Defendants' Exhibit 11B). Dr. Kerns' testimony was brief and confirmed much of the earlier testimony of Mr. Gordon. Both Mr. Gordon and Dr. Kerns testified convincingly that they had never detected any trace of deliberate racial discrimination in any policy, practice or act of the School District since implementation of the 1970 Order (or in the case of Mr. Gordon, since he came with the School District), that the School District had been operated as a unitary system since 1970, and that the Plan not only supported but improved the unitary system.

In addition to the Plan itself, the School District offered voluminous exhibits into the record without objection from the intervenors. These exhibits, in addition to six (6) large maps, were contained in a number of boxes and two large loose-leaf binders and are marked as Defendants' Exhibits 1–13 with subheadings. Mr. Gordon and Dr. Kerns testified that these exhibits were prepared under their direction.

During the trial, the NAACP withdrew its claims for relief set forth in their Motion for Further Relief leaving only the issues of the acceptability of the Plan and its effect on a unitary system.[1] The witnesses called by the NAACP testified regarding aspects of the Plan and complained that racial balances and enrollments at certain schools had not been maintained. The Parker High intervenors called witnesses on the issue of the conversion of that school to a middle school. The other intervenors presented no evidence, but did cross-examine witnesses.

## UNITARY SCHOOL SYSTEM

The central issue facing the Court is whether the School District is a unitary school system, which has eliminated the vestiges of a dual system of state-imposed racial segregation.

■ Since *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), state-imposed racial segregation in public schools has constituted a fundamental violation of the Fourteenth Amendment to the United States Constitution, and that Amendment has required that state-provided education "be made available to all on equal terms." *See* 347 U.S. at 493, 74 S.Ct. at 691. The Fourteenth Amendment requires that a dual system of racially segregated schools be dismantled, that "a system of determining admission to the public schools on a non-racial basis be implemented in its place", *see Brown v. Board of Education*, 349 U.S. 294, 300–301, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955), and that any dual, segregated system be "convert[ed] to a unitary system in which racial discrimination [is] eliminated root and branch", *see Green v. County School Board*, 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968).

■ In other words, school districts and district courts have the duty "to eliminate from the public schools all vestiges of state-imposed segregation", *see Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Further, in proper cases where such issues are raised, the Court should address matters other than pupil assignment, such as policies regarding faculty, staff, and facilities, when those issues must be addressed to eliminate the effects of prior segregation. *See Milliken v. Bradley*, 433 U.S. 267, 283, 97 S.Ct. 2749, 2758, 53 L.Ed.2d 745 (1977). In all areas, school districts have an "affirmative re-

1. The NAACP never filed a memorandum in support of the Motion for Further Relief.

sponsibility" to eliminate dual school systems. *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979).

■ However a district court's jurisdiction over a school district is limited to correcting constitutional violations. Once a district court has implemented a racially neutral plan in order to eliminate state-imposed segregation, the district court has

"fully performed its function of providing the appropriate remedy for previously racially discriminatory attendance patterns, and the district court no longer has supervisory power over the school district".

*Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 437, 96 S.Ct. 2697, 2705, 49 L.Ed.2d 599 (1976). As the Supreme Court explained in *Swann,* 402 U.S. at 31–32, 91 S.Ct. at 1283–1284:

"It does not follow that the community served by a [unitary] system will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished, and racial discrimination through official action is eliminated from the system".

The Fourth Circuit has summarized the law in this area by stating that *"Swann* limit[s] judicial remedial power to cases in which the school authorities have caused segregation.... After racial neutrality in attendance patterns [is] achieved, the District Court [can] not require yearly adjustment of student assignment to ensure racial balance." *Martin v. Charlotte-Mecklenburg Board of Education,* 626 F.2d 1165, 1167 (4th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1758, 68 L.Ed.2d 238 (1981). *See also Morgan v. McKeigue,* 726 F.2d 33 (1st Cir.1984) (vacating district court order and directing district court to explain how its order is necessary and appropriate to achieve desegregation goals not yet fulfilled); *Parents Association of*

*Andrew Jackson High School v. Ambach,* 598 F.2d 705 (2nd Cir.1979) (reversing district court order for ordering racial balance without finding intentional segregation).

■ In addition, it is important to emphasize that, while the Fourteenth Amendment requires that school districts abolish dual systems of state-imposed segregation, there is no constitutional requirement that schools adhere to particular racial ratios. A racially mixed community may have schools that are either predominantly White or predominantly Black, but that "fact without more, of course, does not offend the Constitution." *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977). "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann,* 402 U.S. at 24, 91 S.Ct. at 1280. The Constitution requires the elimination of all vestiges of state-imposed segregated dual school systems, not the perpetual imposition and monitoring of racial ratios.

■ Of course, even if a unitary system has been established in place of a dual segregated school system, a district court may still remedy any subsequent constitutional violation. *See, e.g., Brinkman,* 433 U.S. at 420, 97 S.Ct. at 2775. For there to be a constitutional violation, however, it must be shown that the school district acted *with the intent* of discriminating on the basis of race, and that the school district did in fact discriminate against Black students, teachers, or staff. *See, e.g., Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *see also Brinkman,* 433 U.S. at 420, 97 S.Ct. at 2775.

In this case, the overwhelming evidence establishes beyond doubt that the School District is now operating and has operated as a unitary school system since implementation of Judge Martin's 1970 Order and, without doubt, since Judge Chapman's Or-

der of 1976, and that all vestiges of a state-imposed dual segregated school system have been eliminated from the School District, *root and branch*. That same evidence demonstrates that the School District fully complied with the requirements of both the 1970 and the 1976 orders. Further, there is absolutely no evidence that the School District has acted in any way with the intent of discriminating against Black students, faculty, staff or other personnel on the basis of race. In short, the School District is a unitary school district, has been a unitary school district for many years, and has committed no constitutional violation.

■ Every category of evidence considered at the trial compels a finding that the School District is unitary.

First, the School District's approach to student assignment has been and is unitary, as was found in the 1976 Order. Racially segregated schools in the School District were abolished with the implementation of the 1970 Order. The history of the School District's efforts to maintain a proper racial balance is well documented. For example, Defendants' Exhibit 2B is a simple chart showing the ratio of Black students in every school in this district from 1970–71 through 1984–85 (except for the year 1978–79, which information has been misplaced) and includes the projected enrollment under the new Plan. These figures alone are dramatic proof of the good faith and effectiveness of the District's efforts, and are remarkably close to the applicable target ratios.

For example, during the 1970–71 school year,. no elementary school had more than approximately 37% Black students, and virtually all had Black ratios between 15% and 30%. This general pattern of racial ratios has remained the same, although of course racial percentages have varied as the years have passed in this large district. A similar trend is present in the middle and high schools. No school in the School District is now or has been since 1970 all Black or nearly so.

In a district so large and diverse, it would be unrealistic to expect every school to be kept within the same racial balances. Given this pattern of integrated schools, Judge Chapman understandably held in 1976 that the School District had achieved a unitary system in student assignments. No evidence has been presented that the School District had used school assignment for racial segregation since the 1970 desegregation Order. There is no question that, since 1976, the District has fully complied with Judge Chapman's 1976 Order and has, at least since that time, maintained the unitary system.

In the area of faculty, administration and other personnel, left open by Judge Chapman's Order, the evidence of the School District is overwhelmingly convincing that a unitary system in this area also has been maintained. The School District has in place written policies prohibiting discrimination on the basis of race. The records of the District confirm that this policy has been followed.

Raw data included in Defendants' Exhibit 3D contain the District's EEOC reports for 1973 through 1983. Such reports include an accounting of all district employees by job title, race, and sex. Two benchmark positions have been complied from these reports, those of *teacher* and *principal*. These figures show the gradual decline of available Black teacher applicants; even so, the percentage of Black teachers has not declined drastically. These figures also show a steady growth of the number of Blacks placed in the principalship:

| | Teachers | | |
|---|---|---|---|
| Year | Black | White | Percent |
| 1973 | 416 | 2,367 | 17.8 |
| 1974 | 541 | 2,389 | 22.6 |
| 1975 | 443 | 2,341 | 18.9 |
| 1976 | 422 | 2,291 | 18.4 |
| 1977 | 391 | 2,377 | 16.4 |
| 1978 | 395 | 2,500 | 15.8 |
| 1979 | 419 | 2,515 | 16.7 |
| 1980 | 395 | 2,528 | 15.6 |
| 1983 | 392 | 2,588 | 15.4 |
| 1984 | 451 | 2,503 | 15.3 |

Principals

| Year | Black | White | Percent |
|------|-------|-------|---------|
| 1973 | 14 | 95 | 14.7 |
| 1974 | 14 | 94 | 14.9 |
| 1975 | 14 | 95 | 14.7 |
| 1976 | 14 | 95 | 14.7 |
| 1977 | 13 | 92 | 14.1 |
| 1978 | 13 | 92 | 14.1 |
| 1979 | 15 | 98 | 15.3 |
| 1980 | 15 | 93 | 16.1 |
| 1983 | 16 | 96 | 16.7 |

Data from the District's Comparative Personnel Statistics from 1978 to 1984 are also applicable (See Defendants' Exhibit 3F):

School Administration
(Principals, Assistant Principals)

| Year | Black | White | Percent |
|------|-------|-------|---------|
| 1978 | 37 | 116 | 24.2 |
| 1979 | 36 | 116 | 23.7 |
| 1980 | 35 | 114 | 23.5 |
| 1981 | 34 | 115 | 22.8 |
| 1982 | 38 | 122 | 23.8 |
| 1983 | 39 | 121 | 24.4 |
| 1984 | 41 | 123 | 25.0 |

Other Administrative
(Administrative Support, Consultants, Coordinators, etc.)

| Year | Black | White | Percent |
|------|-------|-------|---------|
| 1978 | 26 | 159 | 14.1 |
| 1979 | 29 | 153.5 | 15.9 |
| 1980 | 31 | 187 | 14.2 |
| 1981 | 30.5 | 191.5 | 13.7 |
| 1982 | 25 | 168 | 12.9 |
| 1983 | 26 | 135 | 16.1 |
| 1984 | 28 | 180 | 13.5 |

Additional Data is found in the District's work force utilization analyses and in *A Report By The Joint Task Force on Student Achievement*, The School District of Greenville County and The Greenville Urban League, December 1982. (Defendants' Exhibits 3E and 3H). These data account for all employees of the District by position title, by location, and by race and/or sex. The study found that 15.4% of all teachers, 24.9% of all counselors, 37.5% of all assistant principals and 15.3% of all principals were Black, percentages commensurate with or exceeding the overall Black professional population.

Further, no intervenor presented any evidence concerning discrimination in the School District's personnel policies or cross-examined the School District's witnesses on this issue. Nor is there any evidence that Black personnel have been segregated in particular schools. Indeed, the NAACP abandoned its claims in this area at trial.

The Court thus finds that the School District has been operated as a unitary system with respect to teachers and non-teaching personnel, as well as student assignment.

There is, likewise, no evidence of racial discrimination in the School District's policies and practices with respect to new construction, site location, renovation or capital expenditures, or closing and conversion of schools. The policies of the District require capital expenditures to be made on the basis of demonstrated need and include a consideration of projected enrollments, considerations unrelated to race. The records of all of the School District's expenditures for new construction, renovation and repairs for the period 1970 to the present time are included in Defendants' Exhibits 6A–F, particularly Exhibits 6A and B. These records indicate that, since the construction of Southside High School in 1970 for a contract price of $1,829,490, there have been sixty two (62) major (in excess of $100,000) renovation or construction projects, including the commitment to build the new Blue Ridge High School. These projects are listed on Appendix B to this Order. A comparison of this list of schools at which this construction has taken place with the racial balances shown on Defendants' Exhibit 2B, Appendix A of this Order reveals no pattern or evidence of racial discrimination. Furthermore, claims in this area have been abandoned by the NAACP.

The policies and practices of the School District in closing schools has been called into question. The NAACP argues that the District has discriminated in closing schools in predominately Black neighborhoods and not closing schools in predominately White neighborhoods. This view is

not supported by any evidence; on the contrary, Mr. Gordon's testimony referred to a number of schools in predominately White neighborhoods which also have been closed.

In addition, the record clearly indicates that the school district has not used new school construction to promote segregation. For example, Buena Vista Elementary school opened this school year, with a student body that is approximately 22% Black; Gateway Elementary school opened in school year 1982–83, with 20% Black students; Greenview Elementary school opened in school year 1980–81 with 27% Black students; and Plain Elementary school, which began in school year 1982–83 with 10% Black students, will have a ratio of 18% Black students under Plan 3. The percentages are similar for middle and high schools. Of course, the racial percentages in eighty-three (83) schools in a large and varied school district must be expected to vary. (See Appendix A and Appendix B).

■ Finally, the Parker High Group has objected to the conversion of Parker High School to a middle school under the new Plan 3. There is no evidence, however, to indicate that the conversion of Parker High School is detrimental in any way to the School District's unitary status. The evidence presented at the trial shows that the School District needed to close one high school because of excess capacity; that Parker High School is located geographically close to three other high schools; that Parker High School was in the worst condition of those four schools; that the four schools together have over 1,000 excess seats; no increase and perhaps even a decline is projected in the number of residents in the Parker High area in future years; that one of the four nearby high schools has already been substantially renovated; and, finally, that the cost to renovate Parker High for use as a high school would be greater than the cost to renovate it for use as a middle school. There is no evidence that the school was closed for any improper reasons. Given these facts, the claims of the Parker High Group have no substance.

In addition to these factors, the NAACP raised a number of questions about two schools in particular during these proceedings, but, like the other facts in the case, the facts surrounding these schools do not indicate that the School District is not unitary.

The NAACP spent a significant portion of its time at trial contesting the status of Southside High School. Southside presently has a student body which is 48% Black, and under Plan 3 the ratio will be 51%. The NAACP also objects to the fact that Southside has an enrollment of less than 1,000 students, thus, in their view making it more difficult to provide a full range of quality programs for its students. Among other things, because of the size of Southside's current enrollment, it is a 2–A school in athletic competition.

■ For several reasons, these facts and criticisms do not call into question the School District's unitary status. Southside is only one of fourteen high schools to be operated under Plan 3 in the School District, and only one of the eighty-three (83) schools in the entire School District. In a large district such as this, it is inevitable that some schools will have higher racial ratios than others, and that fact by itself does not offend the Constitution. *See Dayton Board of Education v. Brinkman*, 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977). Moreover, it should not be surprising that Southside, a school located near a large Black neighborhood, would have a higher ratio of Black students.

■ Furthermore, the School District has responded directly to the problem of under-enrollment in all high schools. In the Resolution adopted by the School Board this year (quoted above), which the Court deems to be part of Plan 3 itself, the School District made a commitment to maintain enrollment in all high schools in the School District (except one remote high school) at a minimum of 1,000 students. Under Plan 3 itself, Southside's enrollment will increase from approximately 700 students to

almost 900, permitting Southside to compete in athletics as a 3–A school, among other things. In addition, the School District pledged to provide essential curriculum and to provide access to desired courses in all of the School District's high schools, subject only to the financial constraints of a projected deficit.[2] Plan 3 and these resolutions are cumulative evidence of the good faith of the School District and of its unitary status in this regard.

■ Finally, the NAACP has raised similar questions with respect to Blythe Elementary School: the NAACP points out that its Black percentage (41% under Plan 3) is high and that its enrollment is low. For the reasons explained above, the status of one school will not necessarily undermine the unitary status of the entire School District. That is particularly true here, where there is no evidence that the School District has acted with discriminatory intent with respect to Blythe. Moreover, Blythe is located near Black neighborhoods, and consequently its Black ratio is naturally higher.

In any event, the School District has taken remedial steps. At first under Plan 3, Blythe was closed, but the School District, following public hearings, decided to keep it open. In addition, Plan 3 reduces the Black percentage at Blythe from 50% to 41%. Finally, in its Resolution (quoted above), which, again, the Court deems a part of Plan 3, the School District pledged to insure that the program at no elementary school will suffer due to its enrollment, and specifically provided that the School District would pay close attention "to increasing the enrollment and maintaining a proper neighborhood" for Blythe.

On these facts, the circumstances of this one elementary school present no challenge to the School District's unitary status, and there certainly is no basis for finding unconstitutional racial discrimination by the School District toward the students in this school.

## SCHOOL CLOSINGS AND CONVERSIONS

The NAACP in this case has challenged some of the school closings in the past. In addition, the Parker High intervenors are participating in the case solely to protest the conversion of Parker High School to a middle school under Plan 3. As explained above, these school closings do not indicate that the School District is not unitary. Out of an abundance of caution, the Court will also address these allegations as if the intervenors were challenging the closings as constitutional violations in and of themselves.[3]

■ These intervenors suggest that the School District should not have closed some schools, and that its plans for Parker High School should be enjoined. It is important to keep in mind that decisions concerning the closing or conversion of schools rest primarily with the School District, and that this Court may take action only in case of a violation of the United States Constitution. By and large, "public education in our Nation is committed to the control of state and local authorities," and federal courts should not ordinarily "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Indeed, the federal courts have "long recognized that local school boards have broad discretion in the management of school affairs." *See Board of Education, Island Trees Union Free School District v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). This Court can interfere in the operation of the School District and its decision to close or convert schools only if a constitutional violation is proven.

---

**2.** The School District is not financially independent, but rather depends upon the Greenville County Legislative Delegation for its tax millage.

**3.** The NAACP has abandoned all claims other than complaints about Plan 3, but the Court will examine the broader issue of school closings, because the School District presented convincing evidence on this issue.

When, as in this case, the allegations against a school district are based on claims of racial discrimination, there is a constitutional violation only if there is proof that the schools were closed or converted for the purpose of discriminating on the basis of race. *See, e.g., Arlington Heights v. Metro Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). *See also Wharton v. Abbeville School District No. 60,* 608 F.Supp. 70 (D.S.C.1984); *Bronson v. Board of Education,* 550 F.Supp. 941, 953 (S.D.Ohio 1982). In determining whether invidious racial discrimination was a motivating factor in a school district's decision, the Court will consider circumstantial, as well as direct, evidence of discriminatory intent, such as the historical background of the decision, the sequence of events leading up to the decision, any departure from normal procedures, the fact that the decision is contrary to evidence strongly favoring another conclusion, and the overall legislative and administrative history of the decision. *See Arlington Heights,* 429 U.S. at 266–268, 97 S.Ct. at 564–565. But to indicate a constitutional violation, the evidence must reveal proof "that a discriminatory purpose has been a motivating factor" in the School District's decision. *See id.* at 265–266, 97 S.Ct. at 563.

The Court has summarized the evidence regarding the closing of schools and the conversion of Parker High School above. The Court will not repeat that summary here. It is enough to hold that the evidence in this case is overwhelming that no discriminatory purpose was involved in the School District's decision to close some schools and to convert others, including the conversion of Parker High School to a middle school.

## MOOTNESS

The original complaint in this case was filed in 1963, as a class action. *See* Complaint, ¶ 3, C.A. No. 4396 (filed August 19, 1963). Of course, when the petitions before this Court were filed (beginning in June, 1984), the original plaintiffs, Black school children and their parents, had long since lost any stake in the litigation, because they had left the school system in the ensuing twenty-two years. Indeed, the NAACP has admitted as much, stating that "[t]he original Plaintiffs in this action no longer have a direct stake in the outcome of the litigation due to the fact that their children have now matriculated through the school system". *See* NAACP Memorandum in Support of Motion for Intervention at p. 3 (filed June 13, 1984). At the trial, Dr. Kerns testified to this obvious fact, namely that the students who were the original plaintiffs in 1963 have undoubtedly left the school system.

The United States Supreme Court has considered cases similar to this one in two instances, *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), and *Indianapolis School Commissioners v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). In both cases, the Court held that the claims of the private plaintiffs before it were moot because the individual student plaintiffs had left the school system and because no class had ever been certified. (In *Pasadena* the presence of the United States as a party prevented dismissal on the ground of mootness).

In this case also, no class has ever been certified. On several occasions, however, the parties and the Court have referred to this action as a class action. *See, e.g.,* NAACP Motion to Intervene at p. 2 (filed June 13, 1984); Order filed October 5, 1964, at p. 1 and 2; Order filed April 27, 1964; and Transcript of Hearing held March 19, 1964 at p. 4 & 5. However, even though the parties and the Court have from time to time referred to this action as a class action and behaved as if it were one, in fact no class has ever been certified under Fed.R. Civ.P. 23(c).

In part, the absence of certification may be explained by the fact that Rule 23 as it existed in 1963 did not require class certification by the Court. However, Rule 23 was amended, effective July 1, 1966, to

include the present requirement of Rule 23(c) for class certification, and that amended rule applies to actions, like this one, pending on its effective date. *See, e.g., Hohmann v. Packard Instrument Co.*, 399 F.2d 711, 713 (7th Cir.1968); *Alvarez v. Pan American Life Insurance Co.*, 375 F.2d 992, 993 (5th Cir.), *cert. denied*, 389 U.S. 827, 88 S.Ct. 74, 19 L.Ed.2d 82 (1967).

The fact that the parties and the Court have treated this suit as a class action does not necessarily save it from mootness. The Supreme Court, faced with analogous facts in *Spangler*, held that the claims of the original student plaintiffs were moot and that the lack of class certification prevented the claims of present students from being heard by the Court. A similar result was reached in *Jacobs.*

 It appears on balance, however, that this action should not be held moot. On similar facts, the United States Court of Appeals for the Fifth Circuit has held an action not moot, even though the class was not certified, on the grounds that the parties and the Court had treated the suit as a class action, and because the suit was clearly designed to benefit the entire class. *Graves v. Whalton County Board of Education*, 686 F.2d 1135 (5th Cir.1982). Further, the Fourth Circuit has held that while intervention cannot be used to revive a lawsuit, the Court may treat intervention as a separate action, particularly when the intervenor has an independent basis for jurisdiction. *Atkins v. State Board of Education*, 418 F.2d 874 (4th Cir.1969). Given the long procedural history of this case, the fact that it has always been treated as a class action by the parties and the Court, the fact that it proceeded for approximately three years under the earlier version of Rule 23, which did not require certification, the fact that all interested parties in the community have had an opportunity to intervene in this action and to participate in the trial, the Court finds that the action is not moot.

## CONCLUSION

For fifteen years, the School District of Greenville County has operated under the mandates of this Court to ensure eradication of the dual system outlawed in *Brown v. Board of Education.* From the beginning, the School District has accepted this responsibility in good faith, and the record abounds with evidence that the School District has eliminated all vestiges of invidious discrimination and segregation throughout its entire system. This is not to say that the school system has reached a state of perfection by any means. There are still many problems to solve and goals to be reached. But these problems appear to be those inherent in any large School District and not those growing from roots planted in the dark days of a dual system.

This Court does not consider the concerns of the intervenors to be unimportant, but finds only that they involve questions which do not rise to Constitutional status and which are properly heard in the administrative or political forum.

The intervenors have charged the School District with serious offenses. At one time, prior to 1970, many of these conditions did exist. Today, however, they exist no longer. Even in this vital area where protection of individual rights is paramount, it is necessary to acknowledge, perhaps even to celebrate, the rare circumstances when a school system can be declared free of the vestiges of deliberate discrimination against Black people. The School District of Greenville County is entitled to such a finding today. This Court acknowledges the tensions experienced by the Greenville community during these past months and hopes that the resolution of this matter will permit reconciliation, and a resolve to implement the new Plan effectively. The legacy of the past fifteen years promotes confidence that this District will never stray beyond the borders of a true unitary system. The law of the land demands nothing less.

THEREFORE, THE COURT HEREBY ORDERS AND DECLARES THAT:

1. The School District of Greenville County is a unitary school district in all aspects of its operations;

2. The School District of Greenville County has committed no violations of the United States Constitution with respect to the matters raised in this proceeding, and

3. This action is dismissed.

# APPENDIX A

## (Defendants' Exhibit 2B)

### THE SCHOOL DISTRICT OF GREENVILLE COUNTY
Black Student Ratios
Elementary Schools—Total School
1970-71—1984-85

| SCHOOL | 1970-71 | 1971-72 | 1972-73 | 1973-74 | 1974-75 | 1975-76 | 1976-77 | 1977-78 | 1979-80 | 1980-81 | 1981-82 | 1982-83 | 1983-84 | 1984-85 | AMENDED PLAN 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alexander (NW) | 35.99 | 21.21 | 25.28 | 30.66 | 31.39 | 27.46 | 29.31 | 32.88 | 24.72 | 28.37 | 29.78 | 30.67 | 36.07 | 31.06 | 27 |
| Armstrong (NW) | 17.90 | 24.52 | 26.80 | 25.10 | 25.81 | 29.24 | 32.08 | 26.75 | 29.95 | 28.75 | 29.37 | 30.08 | 31.23 | 28.16 | 27 |
| Arrington (NW) | 24.60 | 23.20 | 24.77 | 28.75 | 25.61 | 22.77 | 25.14 | 21.38 | 25.57 | 29.55 | 34.76 | 36.65 | 38.03 | 38.84 | 40 |
| Aug. Circle (SW) | 29.35 | 22.27 | 22.56 | 25.84 | 32.05 | 32.98 | 27.81 | 26.62 | 31.18 | 28.89 | 27.75 | 26.89 | 26.06 | 23.81 | 29 |
| Bakers Chapel (SW) | 34.73 | 23.08 | 32.26 | 38.22 | 34.68 | 33.62 | 34.39 | 39.93 | 39.92 | 42.72 | 43.23 | 42.21 | 39.11 | 39.76 | 40 |
| Berea (NW) | 15.42 | 19.22 | 20.41 | 19.57 | 19.30 | 22.49 | 23.04 | 22.69 | 22.07 | 21.20 | 22.45 | 26.17 | 29.14 | 30.73 | 26 |
| Bethel (SE) | 20.73 | 28.77 | 21.53 | 19.21 | 18.30 | 20.87 | 20.00 | 17.30 | 16.54 | 16.44 | 15.98 | 13.57 | 16.07 | 14.81 | 16 |
| Blythe (SW) | 37.08 | 33.27 | 34.07 | 38.37 | 34.19 | 29.22 | 27.20 | 32.19 | 40.00 | 36.92 | 38.35 | 40.00 | 45.78 | 50.20 | 41 |
| Brook Glenn (NE) | 16.46 | 17.88 | 19.32 | 26.32 | 24.09 | 23.16 | 24.90 | 21.86 | 21.49 | 22.61 | 22.94 | 20.92 | 20.55 | 18.68 | 17 |
| Brushy Creek (NE) | 12.41 | 20.95 | 15.87 | 21.70 | 20.04 | 22.42 | 23.60 | 23.95 | 25.76 | 26.14 | 23.17 | 21.58 | 20.45 | 26.46 | 27 |
| Bryson (SE) | 25.78 | 31.90 | 29.60 | 31.35 | 28.61 | 30.30 | 34.93 | 28.33 | 29.40 | 24.24 | 25.46 | 30.42 | 28.62 | 29.57 | 27 |
| Buena Vista (NE) | | | | | | | | | | | | | | 22.37 | 25 |
| Cone (NW) | 19.90 | 16.10 | 16.15 | 22.36 | 21.09 | 27.09 | 28.20 | 29.53 | 34.11 | 35.55 | 31.32 | 34.32 | 29.64 | 23.08 | 26 |
| Crestview (NE) | 18.73 | 15.50 | 21.81 | 20.65 | 14.15 | 16.05 | 16.54 | 14.80 | 10.36 | 9.17 | 7.95 | 10.03 | 12.50 | 13.47 | 16 |
| Duncan Chapel (NW) | 17.41 | 21.77 | 18.45 | 21.35 | 20.00 | 28.35 | 28.96 | 27.09 | 25.46 | 28.64 | 29.45 | 31.24 | 31.59 | 28.24 | 26 |
| East Gantt (SE) | 18.98 | 27.35 | 24.56 | 28.29 | 30.41 | 32.96 | 35.50 | 30.48 | 39.65 | 34.71 | 36.85 | 36.08 | 33.33 | 30.77 | 39 |
| East Greer (NE) | | | 19.94 | 25.66 | 29.86 | 30.46 | 31.61 | 32.96 | 32.79 | 33.10 | 37.68 | 35.83 | 33.18 | 32.00 | 22 |
| East North (NE) | 33.81 | 28.67 | 30.24 | 29.60 | 29.05 | 29.97 | 29.97 | 35.41 | 37.76 | 41.38 | 43.07 | 39.74 | 38.50 | 38.86 | 43 |
| Ebenezer (NW) | 23.57 | 16.03 | 18.18 | 15.56 | 12.18 | 11.49 | 8.48 | 13.11 | 10.41 | 12.56 | 9.78 | 10.04 | 7.89 | 8.97 | 6 |
| El. Woodside (SW) | 28.71 | 23.11 | 19.88 | 25.28 | 21.77 | 22.40 | 23.70 | 26.26 | 30.31 | 32.89 | 32.52 | 35.41 | 34.78 | 32.54 | 32 |
| Fairview (NE) | 17.23 | 15.79 | 17.26 | 22.52 | 25.27 | 26.09 | 25.12 | 21.74 | 20.10 | 22.60 | 20.99 | 21.43 | 18.18 | 15.98 | |
| Fork Shoals (SW) | 17.45 | 20.81 | 22.07 | 23.81 | 17.09 | 14.64 | 16.74 | 14.55 | 12.26 | 20.96 | 20.78 | 22.36 | 21.02 | 20.81 | 20 |
| Fountain Inn (SE) | 32.39 | 25.33 | 21.38 | 22.80 | 22.35 | 18.84 | 17.25 | 19.11 | 23.36 | 26.27 | 28.86 | 28.92 | 28.51 | 28.15 | 25 |
| Gateway (NW) | | | | | | | | | | | | 20.00 | 23.33 | 24.66 | 22 |
| Greenbrier (SE) | 19.67 | 23.18 | 26.02 | 33.54 | 27.56 | 24.30 | 22.71 | 22.84 | 17.56 | 16.47 | 20.85 | 22.12 | 25.08 | 29.26 | 31 |
| Greenview (SW) | | | | | | | | | | 27.46 | 31.49 | 33.96 | 31.98 | 30.95 | 26 |
| Grove (SW) | 25.77 | 21.47 | 20.05 | 26.01 | 32.87 | 34.87 | 37.47 | 38.79 | 36.07 | 38.71 | 39.29 | 40.33 | 37.65 | 39.34 | 40 |
| Hollis (SW) | 31.55 | 25.82 | 25.70 | 28.94 | 33.13 | 30.13 | 35.58 | 33.85 | 36.19 | 39.18 | 36.98 | 38.66 | 39.79 | 36.59 | 36 |
| Lake Forest (NE) | 19.84 | 19.89 | 22.24 | 22.42 | 28.62 | 23.23 | 25.54 | 28.70 | 29.66 | 31.80 | 35.78 | 37.20 | 34.08 | 49.39 | 32 |

| SCHOOL | 1970-71 | 1971-72 | 1972-73 | 1973-74 | 1974-75 | 1975-76 | 1976-77 | 1977-78 | 1979-80 | 1980-81 | 1981-82 | 1982-83 | 1983-84 | 1984-85 | AMENDED PLAN 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Laurel Creek (SE) | 26.84 | 28.51 | 26.13 | 25.98 | 26.16 | 23.84 | 25.95 | 22.16 | 21.23 | 21.05 | 27.87 | 30.08 | 31.88 | 28.08 | 25 |
| Mauldin (SE) | 25.90 | 22.37 | 22.46 | 26.24 | 22.49 | 26.14 | 27.71 | 26.67 | 28.10 | 26.12 | 26.22 | 25.32 | 25.42 | 26.54 | 30 |
| Mitchell Road (NE) | 17.29 | 15.32 | 15.25 | 20.53 | 27.23 | 26.96 | 25.31 | 20.54 | 25.08 | 25.41 | 28.83 | 28.67 | 29.97 | 30.60 | 28 |
| Monaview (NW) | 15.75 | 21.14 | 21.22 | 20.78 | 20.34 | 20.47 | 20.36 | 20.33 | 23.48 | 22.38 | 22.55 | 23.83 | 24.64 | 28.57 | 26 |
| Morton (SE) | 25.08 | 24.25 | 28.30 | 23.21 | 27.84 | 28.80 | 26.32 | 26.00 | 31.56 | 29.70 | 30.48 | 32.93 | 22.07 | 22.97 | 21 |
| Mountain View (NW) | 4.46 | 13.51 | 14.67 | 13.97 | 13.37 | 7.22 | 11.20 | 14.53 | 9.70 | 9.45 | 8.16 | 7.97 | 8.39 | 8.64 | 5 |
| Overbrook (SE) | 26.05 | 29.26 | 36.25 | 34.86 | 50.00 | 52.52 | 55.32 | 55.81 | 75.00 | 76.98 | 77.31 | 79.46 | 68.97 | 66.32 | |
| Paris (NE) | 16.37 | 33.02 | 29.23 | 26.68 | 26.34 | 27.65 | 28.95 | 29.46 | 25.55 | 20.16 | 23.58 | 19.58 | 19.34 | 28.71 | 25 |
| Pelham Road (NE) | 20.93 | | | | 27.98 | 27.03 | 26.97 | 22.31 | 21.36 | 20.60 | 18.18 | 21.19 | 20.44 | 20.15 | 20 |
| Plain (SE) | | | | | | | | | | | | 10.11 | 14.40 | 18.66 | 18 |
| Sans Souci (NW) | 17.95 | 26.15 | 26.11 | 19.88 | 18.25 | 30.95 | 29.07 | 32.00 | 28.62 | 27.71 | 29.76 | 39.68 | 38.67 | 35.56 | 27 |
| Sara Collins (SE) | 29.82 | 21.46 | 31.91 | 25.91 | 34.63 | 27.35 | 33.12 | 33.07 | 28.72 | 26.17 | 23.91 | 23.66 | 23.91 | 24.64 | 27 |
| Simpsonville (SE) | 25.62 | 23.54 | 23.95 | 22.07 | 22.40 | 21.43 | 20.64 | 17.64 | 16.51 | 13.61 | 10.68 | 11.34 | 12.46 | 11.59 | 13 |
| Sirrine (SE) | 26.84 | 26.55 | 30.23 | 30.88 | 33.73 | 33.26 | 38.50 | 45.84 | 56.13 | 48.98 | 51.96 | 54.84 | 56.36 | 60.94 | 49 |
| Skyland (NE) | 5.11 | 13.62 | 12.60 | 15.44 | 14.87 | 17.41 | 16.32 | 13.62 | 8.59 | 6.23 | 6.95 | 5.55 | 4.61 | 3.61 | 6 |
| Slat.-Marietta (NW) | 5.76 | 4.79 | 5.14 | 5.76 | 6.96 | 6.68 | 5.28 | 11.86 | 15.02 | 13.21 | 13.95 | 10.60 | 10.30 | 10.88 | 10 |
| Stone (SW) | 34.25 | 22.57 | 28.44 | 32.69 | 35.56 | 29.46 | 33.63 | 31.34 | 33.65 | 31.91 | 37.50 | 37.09 | 43.39 | 35.91 | 28 |
| Sue Cleveland (SW) | 9.29 | 6.52 | 5.97 | 7.56 | 14.54 | 19.15 | 21.10 | 25.25 | 31.03 | 33.14 | 36.26 | 32.39 | 40.95 | 40.26 | 36 |
| Summit Drive (SW) | 20.00 | 24.51 | 24.84 | 29.22 | 30.06 | 32.72 | 32.73 | 31.80 | 35.29 | 31.33 | 27.33 | 24.19 | 26.89 | 26.42 | 21 |
| Taylors (NE) | 18.37 | 22.58 | 24.95 | 21.99 | 20.38 | 27.19 | 28.16 | 30.07 | 32.95 | 36.27 | 37.35 | 43.66 | 43.70 | 32.80 | 26 |
| Tigerville (NW) | 3.63 | 6.60 | 6.81 | 6.08 | 7.37 | 6.22 | 6.06 | 6.08 | 4.94 | 5.68 | 5.45 | 5.95 | 7.10 | 5.78 | 3 |
| Trav. Rest (NW) | 15.28 | 12.71 | 12.25 | 24.27 | 26.03 | 25.20 | 24.08 | 21.25 | 22.09 | 21.82 | 22.01 | 20.32 | 21.51 | 31.29 | 27 |
| Tryon St. (NE) | 25.95 | 17.99 | 18.66 | 21.23 | 21.01 | 18.02 | 19.21 | 16.72 | 22.97 | 23.40 | 25.65 | 25.65 | 22.54 | 21.15 | 18 |
| Wade Hampton (NE) | 21.64 | 25.76 | 31.68 | 28.07 | 28.9 | 26.03 | 27.72 | 26.91 | 30.97 | 28.16 | 26.81 | 36.59 | 40.48 | 35.55 | 33 |
| Welcome (SW) | 23.75 | 15.69 | 18.64 | 16.70 | 19.48 | 27.74 | 29.55 | 32.64 | 29.19 | 31.58 | 36.16 | 37.53 | 35.33 | 38.83 | 37 |
| Westcliffe (NW) | 17.16 | 19.53 | 18.26 | 15.48 | 27.64 | 28.83 | 29.25 | 30.20 | 27.39 | 25.44 | 22.68 | 28.99 | 26.90 | 24.94 | 32 |
| W. Greenville (SW) | 25.12 | 27.60 | 38.92 | 28.06 | 11.67 | 24.10 | 34.69 | 33.17 | 35.09 | 34.12 | 33.08 | 39.04 | 38.16 | 42.28 | |
| Woodland (NE) | 21.70 | 25.11 | 28.16 | 24.28 | 21.31 | 20.31 | 24.29 | 18.98 | 17.18 | 16.26 | 17.12 | 18.71 | 19.59 | 26.65 | 31 |
| Total Elementary All Grades | 22.07 | 21.30 | 22.49 | 23.81 | 23.29 | 25.59 | 26.37 | 25.36 | 26.18 | 26.27 | 24.95 | 27.20 | 27.25 | 27.42 | |

## MIDDLE SCHOOLS

| SCHOOL | 1970–71 | 1971–72 | 1972–73 | 1973–74 | 1974–75 | 1975–76 | 1976–77 | 1977–78 | 1979–80 | 1980–81 | 1981–82 | 1982–83 | 1983–84 | 1984–85 | AMENDED PLAN 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beck (SE) | 20.22 | 27.60 | 30.20 | 30.04 | 29.65 | 31.08 | 32.16 | 34.71 | 34.55 | 37.02 | 34.06 | 34.32 | 36.11 | 37.04 | 35 |
| Berea (NW) | | | 15.34 | 14.34 | 12.78 | 14.15 | 12.62 | 16.16 | 22.50 | 26.38 | 26.94 | 28.20 | 28.77 | 28.52 | 27 |
| Bryson (SE) | | | | 18.61 | 18.96 | 19.74 | 17.09 | 14.60 | 20.70 | 22.61 | 20.69 | 18.74 | 20.25 | 16.88 | 16 |
| Greenville (NE) | 23.84 | 24.60 | 22.89 | 24.11 | 24.70 | 28.91 | 30.43 | 31.26 | 30.12 | 30.57 | 28.09 | 28.19 | 27.27 | 34.65 | 27 |
| Greer (NE) | | 16.37 | 18.20 | 18.10 | 18.75 | 18.87 | 18.45 | 18.62 | 21.58 | 20.64 | 20.59 | 19.56 | 17.24 | 16.93 | 14 |
| Hillcrest (SE) | 24.77 | 23.12 | 21.19 | 21.72 | 18.96 | 19.91 | 21.73 | 22.81 | 17.50 | 14.71 | 15.67 | 14.77 | 14.41 | 17.30 | 14 |
| Hollis (SW) | 27.42 | 23.37 | 22.72 | 25.32 | 24.72 | 27.62 | 29.12 | 27.15 | 36.31 | 33.60 | 37.86 | 42.03 | 38.54 | 38.57 | |
| Hughes (SW) | 31.59 | 25.26 | 29.01 | 30.84 | 38.57 | 35.96 | 40.07 | 38.30 | 40.31 | 38.12 | 39.15 | 42.27 | 43.34 | 45.32 | 39 |
| Lakeview (NW) | | 24.02 | 22.79 | 23.17 | 21.00 | 20.62 | 20.78 | 20.80 | 26.75 | 29.54 | 26.97 | 28.93 | 27.80 | 30.39 | 24 |
| League (SW) | 18.16 | 22.15 | 19.51 | 20.89 | 22.67 | 30.69 | 30.48 | 32.73 | 35.15 | 34.82 | 34.94 | 34.02 | 31.43 | 26.66 | 26 |
| Monaview (NW) | 14.79 | 20.65 | 22.63 | 26.12 | 21.02 | 25.67 | 25.85 | 26.22 | 24.68 | 25.64 | 27.31 | 25.64 | 28.71 | 31.30 | |
| Northwest (NW) | | | | 10.63 | 9.88 | 9.70 | 9.90 | 10.85 | 12.07 | 15.65 | 16.67 | 17.31 | 16.21 | 15.38 | 11 |
| Northwood (NE) | 18.76 | 23.16 | 23.01 | 20.81 | 21.29 | 21.87 | 24.34 | 22.76 | 22.64 | 18.87 | 18.16 | 16.48 | 18.58 | 20.24 | 24 |
| Parker | | | | | | | | | | | | | | | 35* |
| Sevier (NE) | 30.09 | 18.49 | 19.66 | 23.44 | 26.76 | 24.17 | 25.61 | 27.85 | 35.80 | 29.61 | 29.23 | 24.57 | 28.75 | 31.65 | 28 |
| Tanglewood (SW) | 20.24 | 23.22 | 24.62 | 26.51 | 28.11 | 30.88 | 32.93 | 34.85 | 37.23 | 42.87 | 38.56 | 38.50 | 37.11 | 36.35 | 38 |
| Woodmont (SW) | | | | | | | | | | | | 28.22 | 27.45 | 29.11 | 26 |
| Total Middle Schools All Grades | 22.98 | 21.38 | 22.69 | 23.50 | 22.55 | 23.75 | 24.57 | 26.23 | 26.95 | 27.19 | 26.38 | 28.36 | 26.14 | 26.93 | |

HIGH SCHOOLS

| SCHOOL | 1970-71 | 1971-72 | 1972-73 | 1973-74 | 1974-75 | 1975-76 | 1976-77 | 1977-78 | 1979-80 | 1980-81 | 1981-82 | 1982-83 | 1983-84 | 1984-85 | AMENDED PLAN 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Berea (NW) | 18.94 | 17.81 | 16.30 | 16.35 | 14.72 | 15.90 | 14.79 | 15.20 | 14.83 | 14.58 | 16.14 | 16.02 | 18.98 | 19.83 | 26 |
| Blue Ridge (NE) | 2.11 | 11.80 | 13.97 | 12.40 | 12.87 | 13.74 | 13.09 | 13.18 | 11.43 | 11.20 | 9.58 | 6.53 | 5.08 | 5.29 | 5 |
| Carolina (SW) | 21.17 | 22.29 | 22.40 | 23.90 | 26.94 | 28.51 | 31.80 | 32.24 | 38.06 | 37.39 | 36.24 | 39.49 | 39.00 | 40.96 | 38 |
| Eastside (NE) | 16.30 | 19.68 | 17.80 | 17.46 | 13.13 | 12.42 | 11.33 | 12.08 | 11.59 | 12.76 | 12.67 | 13.99 | 14.40 | 12.88 | 13 |
| Greenville (SW) | 25.42 | 23.70 | 26.63 | 26.49 | 33.58 | 31.14 | 33.75 | 34.62 | 37.63 | 40.46 | 43.73 | 46.42 | 44.41 | 42.33 | 35 |
| Greer (NE) | 16.29 | 15.03 | 17.06 | 21.81 | 20.72 | 23.59 | 20.67 | 21.61 | 23.80 | 29.92 | 31.60 | 27.60 | 45.24 | 25.80 | 23 |
| Hillcrest (SE) | 25.00 | 19.31 | 19.66 | 23.46 | 23.12 | 21.88 | 21.85 | 22.51 | 25.96 | 25.09 | 27.11 | 24.74 | 26.22 | 24.73 | 23 |
| J. L. Mann (SE) | 27.33 | 27.09 | 29.00 | 24.92 | 23.97 | 24.08 | 26.08 | 27.03 | 28.85 | 30.74 | 32.94 | 31.85 | 34.48 | 33.69 | 31 |
| Mauldin (SE) | | | | 18.80 | 19.14 | 18.39 | 18.12 | 17.32 | 13.66 | 13.07 | 11.44 | 13.14 | 15.00 | 18.89 | 11 |
| Parker (NW) | 13.21 | 17.77 | 20.83 | 21.39 | 19.06 | 20.39 | 21.09 | 20.18 | 23.00 | 26.03 | 28.93 | 31.21 | 32.40 | 36.61 | |
| Riverside (NE) | | | | 21.39 | 19.97 | 17.51 | 20.02 | 18.96 | 18.46 | 18.04 | 16.79 | 16.03 | 16.42 | 14.99 | 15 |
| Southside (SW) | 38.58 | 30.31 | 31.91 | 33.43 | 35.37 | 34.59 | 38.62 | 42.44 | 49.04 | 52.20 | 48.77 | 47.58 | 51.98 | 48.13 | 51 |
| Trav. Rest (NW) | 13.04 | 15.69 | 16.14 | 18.60 | 19.88 | 18.77 | 17.68 | 18.14 | 17.25 | 18.29 | 16.50 | 15.69 | 15.23 | 15.36 | 13 |
| Wade Hampton (SE) | 13.13 | 16.09 | 17.95 | 18.28 | 17.55 | 18.01 | 18.62 | 19.02 | 20.26 | 21.87 | 22.78 | 21.29 | 23.08 | 22.55 | 23 |
| Woodmont (SW) | 22.22 | 19.00 | 17.20 | 20.51 | 17.23 | 20.06 | 23.37 | 26.74 | 28.47 | 31.32 | 31.87 | 35.22 | 33.87 | 34.26 | 28 |
| Total High Schools All Grades | 20.60 | 19.62 | 20.66 | 21.43 | 21.22 | 21.28 | 21.91 | 22.44 | 23.63 | 24.88 | 25.07 | 24.88 | 26.70 | 25.44 | |
| Total All Grades | 21.75 | 21.09 | 21.95 | 22.96 | 22.44 | 23.64 | 24.40 | 24.58 | 25.50 | 26.02 | 25.33 | 26.73 | 26.78 | 26.65 | |

## APPENDIX B

### New Construction and Other Capital Expenditures Since 1970

| Year | Description | Amount |
|------|-------------|-------:|
| 1970 | Construction of Southside High | 1,829,490 |
| 1970 | Addition to Ebenezer Elementary | 330,471 |
| 1970 | Addition to Woodmont High | 267,805 |
| 1970 | Addition to Greer High | 294,289 |
| 1970 | Construction of Crestview Elementary | 376,026 |
| 1970 | Construction of Eastside High | 1,601,509 |
| 1970 | Construction of Sevier Middle | 1,252,766 |
| 1970 | Addition to Tanglewood Middle | 175,382 |
| 1970 | Purchase of 34.04 acres on Devenger Road for a proposed middle school | 81,200 |
| 1971 | Construction of Sara Collins Primary | 361,458 |
| 1971 | Construction of Donaldson Area Vocational Center | 932,648 |
| 1971 | Conversion of Lincoln School into Foothills Vocational Center | 593,934 |
| 1971 | Addition to Fork Shoals Elementary | 108,737 |
| 1971 | Construction of Greer Middle | 1,427,342 |
| 1971 | Addition to Hillcrest High (Library) | 67,000 |
| 1971 | Construction of Lakeview Middle | 1,147,741 |
| 1972 | Addition to Mitchell Road Elementary | 148,504 |
| 1972 | Construction of Enoree Area Vocational Center | 813,204 |
| 1972 | Construction of Berea Middle | 1,408,983 |
| 1972 | Construction of Eastside High addition | 365,489 |
| 1972 | Purchase of 16.3 acres for a proposed elementary on Black Drive | 56,400 |
| 1973 | Purchase of 18.5 acres for Plain Elementary | 44,000 |
| 1973 | Purchase and renovation of Distribution Center | 798,488 |
| 1973 | Purchase of 82.42 acres for Woodmont Middle | 74,178 |
| 1973 | Addition to Travelers Rest High | 534,261 |
| 1973 | Construction of Northwest Middle | 1,838,668 |
| 1973 | Construction of Riverside High | 2,174,378 |
| 1973 | Construction of Mauldin High | 2,690,949 |
| 1974 | Construction of Administrative Center | 1,269,231 |
| 1974 | Renovation of Fine Arts Center | 132,550 |
| 1974 | Conversion of Northeast Area Office into Human Resource Development Center | 89,445 |
| 1974 | Purchase of 11.7 acres for Taylors Elementary | 65,000 |
| 1974 | Construction of Southeast Area Office | 89,445 |
| 1974 | Construction of Southwest Area Office | 89,445 |
| 1974 | Construction of the Northwest Area Office | 89,445 |
| 1975 | Addition to Brushy Creek Elementary | 150,000 |
| 1975 | Addition to Brook Glenn Elementary | 150,000 |
| 1975 | Construction of Pelham Road Elementary | 1,044,484 |
| 1975 | Construction of Slater Marietta Elementary | 1,350,535 |
| 1975 | Purchase of 30.0 acres on Verdin Road for a proposed middle school | 86,760 |
| 1976 | Rebuilding of Berea Middle School (Burned) | 987,207 |
| 1976 | Renovation of Augusta Circle Elementary | 583,872 |
| 1976 | Renovation of Hillcrest High | 508,363 |
| 1976 | Renovation of Stone Elementary | 460,542 |
| 1977 | Purchase of additional land for Greenville High | 200,000 |
| 1977 | Addition to Hillcrest High (Gym) | 246,200 |
| 1978 | Construction of Golden Strip Vocational Center | 1,846,365 |
| 1978 | Addition and renovation to Greenville High | 1,866,159 |
| 1978 | Renovation and addition to Paris Elementary | 1,319,073 |
| 1979 | Renovation of Overbrook Elementary | 307,854 |
| 1979 | Construction of Amphitheatre, Roper Mountain | 292,731 |
| 1980 | Addition to Grove Elementary | 1,185,714 |
| 1980 | Construction of Greenview Elementary | 2,430,178 |
| 1981 | Construction of Taylors Elementary | 3,841,017 |
| 1982 | Construction of Horticulture Center, Roper Mountain | 873,676 |
| 1982 | Construction of Gateway Elementary | 3,719,317 |
| 1982 | Addition to Simpsonville Elementary | 163,163 |
| 1982 | Construction of Woodmont Middle | 6,978,872 |
| 1982 | Construction of Plain Elementary | 3,297,499 |
| 1982 | Renovation of Travelers Rest Elementary | 712,956 |
| 1983 | Addition to and renovation of Sue Cleveland Elementary | 105,629 |
| 1984 | Construction of Buena Vista Elementary | 2,677,962 |
| 1986 | Construction of New Blue Ridge High | 10,000,000 |