Robert A. WHARTON, Samuel Otto Smith, Earlie E. Finley, William F. Cunningham, Wallace Cunningham, Albert Woods, Daisy F. Goodwin, Joseph Young, Lillie B. Ward, Robert L. McAdams, Gloria Anderson, Raymond Finley, P.L. Stackhouse, Abner Washington, Jerome L. Watt, Waymon Cunningham, Olin B. Pearson, M.L. Sanders, Calvin O. Ryan, Vernetter Valentine, Raymond C. Aiken, R.C. Aiken, Dorothy Brownlee and Walter Young, Plaintiffs,

v.

ABBEVILLE SCHOOL DISTRICT NO. 60, John Allen, James M. Wright, Dr. Charles Loyd, Claude T. Hughes, George L. Morrow, S.F. Sherard, Jr., Walter R. Hilley, Edward L. Hagan, and Jim Ashley, Defendants.

Civ. A. No. 83–1199–3.

United States District Court,
D. South Carolina,
Greenwood Division.

Oct. 10, 1984.

Theo W. Mitchell, Fletcher N. Smith, Mitchell, Smith & Pauling, Greenville, S.C., for plaintiffs.

Thomas E. Hite, Jr., Hite & Pruitt, Abbeville, S.C., Robert M. Erwin, Jr., Burns, McDonald, Bradford, Erwin & Patrick, Greenwood, S.C., for defendants.

GEORGE ROSS ANDERSON, Jr., District Judge.

The Plaintiffs allege that this action is brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986 and the First, Fourth, Fifth, Ninth, Thirteenth, and Fourteenth Amendments to the United States Constitution. The Plaintiffs sought a temporary restraining order and permanent injunction to prevent the closing of Carver Middle School which was denied by Order of this Court on June 22, 1983 and the appeal of said Order was dismissed by the Court of Appeals on December 30, 1983. 725 F.2d 678 (4th Cir.). The Defendants thereafter moved for a Summary Judgment which was denied. On April 16, 1984, a hearing on the merits of this action was held and the attorneys present representing the Plaintiffs were Theo W. Mitchell and Fletcher N. Smith, Jr., and representing the Defendants were Thomas E. Hite, Jr. and Robert M. Erwin. Prior to the hearing the Court quashed three items which Plaintiffs requested on the subpoena duces tecum directed to Dr. Jack McCorkle, Superintendent of the Defendant School District, dealing with racial makeup of teachers and accreditation of schools. However, during the first day of trial, the Court reconsidered its decision and directed the Defendants to provide to the Plaintiffs all the information available which the Plaintiffs sought. At the conclusion of the testimony of the hearing in April, 1984, evidence was submitted by the Defendants which showed that over the past ten years the number of black teachers has substantially decreased in Abbeville County and further inquiry was necessary by the Court. The Court ordered a continuation of the trial to give the Plaintiffs the opportunity to produce any evidence of individual discriminatory treatment of black individuals or any evidence of policies and practices of the Defendants which had a racially disproportionate impact. During the interim period, counsel for both parties fully cooperated with each other in the exchange of relevant information and documents thereby negating the necessity for further depositions. The trial was resumed on August 30, 1984 at which time both parties presented evidence on the issue of the decline in the number of black teachers and any racially disproportionate impact brought about by the conduct of the Defendants in Abbeville County. At the conclusion of the testimony both parties moved for directed verdicts which were denied.

## FINDINGS OF FACT

Based upon the verified pleadings, testimony at the two hearings and exhibits presented to the Court, the Court makes the following findings of fact:

1. That the parties are subject to the jurisdiction of this Court and all parties are properly before the Court and represented by counsel.

2. That the Court has liberally construed the complaint to consider any official policy or actions of the Defendants which results in a disparate impact upon the black citizens of Abbeville County, South Carolina.

3. That the Defendants pursuant to *S.C.Code Ann.* § 59–19–90(7) (1976) as amended have authority to manage and control local educational interests of its district, with the exclusive authority to operate or not to operate any public school or schools.

4. That the Defendants, as trustees for Abbeville County School District 60 which embraces all of Abbeville County, were faced with a Three Hundred Thousand ($300,000.00) Dollar budget deficit in operational funds for the school year 1983–1984 and budgetary considerations dictated the closing of one or more schools.

5. That the Defendants do not have a shortage of capital funds for building new schools or making improvements to existing schools but are prohibited under South Carolina law to use these funds for operational expenses. *S.C.Code Ann.* § 59–21–350 (1976).

6. The Trustees for School District 60 first considered closing three elementary schools in Abbeville County: Sharon, Antreville, and Lowndesville Elementary. This decision was based upon a ten year old State Department of Education study. This study had not been updated and did not consider shifts in population in Abbeville County.

7. That after voting to close Sharon, Antreville and Lowndesville elementary schools for the school year 1983–1984, the School Board directed superintendent, Dr. Jack S. McCorkle to conduct an up to date, in-depth study to determine population shifts and to actually plot the residence of each student effected on the County map. (Court Exhibit 1, 2, 3) Further the study was to consider the additional factor of the financial impact upon the School District's operational budget of the available alternatives.

8. That once the students who attended the affected schools were plotted on the County maps, the Defendants discovered that if Lowndesville Elementary and Antreville Elementary were both closed, approximately one-third of the geographic area of Abbeville County would be without any schools causing long distance bussing for students from other areas of the County. However, in Due West, South Carolina, some ten miles north of Antreville, there would be three schools within approximate one mile radius: namely Due West Elementary, Carver Middle School and Dixie High School.

9. That according to a recent study by the Upper Savannah River Council of Governments the Due West, South Carolina area is projected to decline in population while the Antreville, South Carolina area is projected to grow. This projection is supported by the fact that Carver Middle School, which housed grades five through eight, has declined in enrollment over its last ten years by twenty-nine (29%) percent.

10. When Carver Middle School was closed, long distance bussing, which in some cases exceeded twenty-five miles one way, was eliminated for forty-three black students and forty-four white students. Students who formerly attended Carver Middle School and who live in Due West, South Carolina, now attend either Due West Elementary or Dixie High School, which are located approximately one mile from Carver Middle School. Students in the Antreville area, grades Five through Seven, who formerly attended Carver Middle School in Due West, South Carolina, now attend Antreville Elementary in Antreville, South Carolina, which houses grades kindergarten through seven.

11. The ratio of black students to white students at Carver Middle School during the 1982–1983 school year was fifty (50%) percent white and fifty (50%) percent black consisting of a total of one hundred and thirty-five black students and one hundred and thirty-four white students.

12. The ratio of black students to white students for the school year 1983–1984 in the schools where the Carver Middle School students were transferred; namely, Antreville Elementary and Due West Elementary, are as follows: Antreville Elementary, Forty-seven (47%) percent black, Fifty-three (53%) percent white with a total of

Ninety-five black students and one hundred and nine white students; and Due West Elementary, Forty-six (46%) percent black and Fifty-four (54%) percent white with a total of one hundred and twenty-nine black students and one hundred and fifty-four whites.

13. That all vestiges of a dual segregated school system have been eliminated in Abbeville County and this fact is shown by the enrollments by race for every school in the County for the school year 1983–1984. There is a total student population of one thousand nine hundred nine black students and two thousand one hundred eighty-eight white students for a ratio of forty-seven (47%) percent black students to fifty-three percent (53%) percent white students. The ratios of black to white students at the individual schools in the County are as follows:

| School | Black % | White % | Location |
| --- | --- | --- | --- |
| Dixie High School | 43% | 57% | Due West, S.C. |
| Due West Elementary | 46% | 54% | Due West, S.C. |
| Donalds Elementary | 20% | 80% | Donalds, S.C. |
| Antreville Elementary | 47% | 53% | Antreville, S.C. |
| Abbeville High School | 51% | 49% | Abbeville, S.C. |
| Greenville St. Ele. | 56% | 44% | Abbeville, S.C. |
| Langley-Miliken Ele. | 41% | 59% | Abbeville, S.C. |
| Sharon Elementary | 46% | 54% | Abbeville, S.C. |
| Wright Middle Sch. | 51% | 49% | Abbeville, S.C. |
| Calhoun Falls High School | 41% | 59% | Calhoun Falls, S.C. |
| John C. Calhoun Ele. | 48% | 52% | Calhoun Falls, S.C. |

14. That while the people who live adjacent to Carver Middle School are black, less than two blocks away are white residents and it appears from the Defendant's maps that both Carver Middle School and Antreville Elementary School are located in integrated communities.

15. The best decision for the Defendants, solely from a economic standpoint, was to close Carver Middle School with a projected savings of Ninety-two Thousand Five Hundred Fifty-one ($92,551.00) Dollars and Lowndesville Elementary with a projected savings of Seventy Thousand Six Hundred Fifty-five ($70,655.00) Dollars. All other reasonable alternatives were considered by the Defendants.

16. The physical facilities and academic standing at Antreville Elementary School and Carver Middle School are comparable.

17. As a result of the closing of Carver Middle School, no teachers or principals were fired or demoted. The black principal at Carver Middle School is now principal at Due West Elementary School and the black principal at Lowndesville Elementary is now the principal at John C. Calhoun Elementary School.

18. The Court has carefully considered the Plaintiffs' assertions that the Defendants have the burden of rebutting a *prima facie* case of disparate impact which the Plaintiffs assert has been established by the evidence presented to the Court. I find that a *prima facie* case of disparate impact has not been established by the evidence of alleged disparate treatment of black teachers and black students concerning hiring, firing and promotion practices of teachers and the closing of schools. While there has been an overall decline in the percentage of black teachers since 1972, there is no evidence of either intentional segregative action or a recent history of racial discrimination in the Defendants' school system. The Defendants introduced evidence which was clear and convincing which would have rebutted any presumption which may have arisen from the discrimination shown in *Reynolds v. Abbeville School District # 60* 554 F.2d 638 (1977).

19. The Court is concerned with the decline in black teachers and considered carefully the testimony on this issue. The Defendants conducted a thorough study of this matter using documents on file at the district office as well as State Department of Education studies. The Plaintiffs were unable to produce any testimony which showed that the Defendants discriminated against black applicants or teachers in their hiring, salary or promotional practices.

20. In the 1972–73 school year there were one hundred and sixty-six (sixty-eight percent) (68%) white teachers and Fifty-three (thirty-two percent) (32%) black teachers. These figures approximately correspond to the population of Abbeville Coun-

ty which is two to one white to black. Through the 1977–1978 school year the percentage of black teachers declined in number to twenty-three percent (23%), rose to twenty-nine percent (29%) in 1978–1979 and thereafter black teachers gradually declined to approximately seventeen percent (17%) at the present time.

21. The documents from the State Department of Education in South Carolina indicate that Abbeville County has one of the lowest average teacher salaries in the State with the County paying the absolute state minimum. This factor coupled with the decline in black teachers statewide makes it difficult for a rural county like Abbeville, which pays the state minimum, to recruit and retain qualified black teachers. All of the twelve school districts in the counties surrounding Abbeville with the exception of McCormick County pay on average a minimum of Five Hundred and Seventy-five ($575.00) Dollars per year to a maximum of One Thousand Eight Hundred and Fifty-two ($1,852.00) Dollars more than Abbeville County. Two of the Defendants' witnesses, who were black teachers, testified that salary was a factor in either rejecting a job in Abbeville or leaving Abbeville County to go to a higher paying job in a neighboring district. Amos Cunningham, who has a B.A. degree in Art and is presently employed at Michelin Tire Company, was a Plaintiffs' witness who applied in 1980 for an art position. He was not hired and Dr. McCorkle, the former Superintendent of Education for the Defendants, stated that there were no openings in Art at that time. When an opening in art came available in the 1984–1985 school year, Mr. Cunningham was offered a teaching position which he declined because he would have taken a Ten Thousand ($10,000.00) Dollar cut in salary. The Plaintiffs offered no evidence concerning the relevant labor market for black teachers. Hannah Simmons, a black teacher, applied in 1974 for a biology or science position but was not hired because there were no biology or science positions available and took a job in a surrounding school district. Shirley Crosby, another black teacher, who applied for a teaching position, was hired by a surrounding school district prior to the time she could have been offered a job by the Defendants. Anna Tisdale, who applied for a teaching position with the Defendants did not have an "A" teacher's certificate. The Plaintiffs' witnesses who testified concerning promotions did not show that race was a factor in the promotion decisions of the Defendants. Bobby Crosby, who has a B.S. degree in vocational agriculture and a M.Ed. from Clemson University, applied for principalships at various schools in 1979, 1981 and 1983 and was given the principal's position in the area of his expertise at the Abbeville Vocation Center in the 1984–1985 school year. In all of the upstate South Carolina School districts, black teachers have declined since the 1974–1975 school year. Abbeville County declined in the percentage of black teachers by seven and seven tenths percent (7.7%) while two of the surrounding school districts in another county declined by as much as thirteen and five tenths percent (13.5%) while paying a much higher average salary than Abbeville. Considering the upstate school districts in the State Department of Education figures the following declines in black teachers were noted.

| | | |
|---|---|---|
| 1% to 5% decline | — | 19 School Districts |
| 6% to 10% decline | — | 12 School Districts (Abbeville County) |
| 11% to 16% decline | — | 3 School Districts |
| 17% to 21% decline | — | 1 School District |

22. Even though black teachers have declined in Abbeville County, forty-six percent (46%) of the black teachers who were employed in March of 1972 are still employed. Eleven percent (11%) of the black teachers retired, thirty-nine percent (39%) resigned and four percent (4%) were released for cause. Of the thirty-nine percent (39%) who resigned thirty percent (30%) left Abbeville County to go to higher paying school districts and sixteen percent (16%) went to graduate school. Further, of the twelve principals in Abbeville County six are black; thus sixteen percent (16%) of the black teachers in Abbeville County are

in supervisory positions while only three percent (3%) of the white teachers are in supervisory positions.

23. Under the Education Reform Act in South Carolina the State Legislature apparently recognized the problem of declining black teachers and is now requiring each school district to submit an affirmative action plan to the State. There is no credible evidence that there was any racially discriminatory intent on the part of the Defendants in bringing about this decline in black teachers. It further appears that the Defendants are actively recruiting qualified black teachers.

24. The closing of Carver Middle School has improved the accreditation of the entire district by the State Department of Education. This was accomplished by transferring teachers from Carver to their appropriate fields and grade levels.

25. The Defendants are moving forward with further consolidation efforts and a new elementary school is under construction to house the students when Sharon Elementary and Langley Miliken Elementary are closed.

26. In closing Carver Middle School and transferring its pupils to other schools, the School Board was exercising its judgment in consideration of a sound educational program, good administrative practice, safety of the students, and the efficient and economic use of its physical facilities.

27. The decision to close Carver Middle School was not based on any motive or intent on the part of the School Board to impose any burden upon any group of pupils because of their race. The Plaintiffs have failed to produce any evidence showing any intent to discriminate *de jure* or *de facto,* nor has any motive of racial discrimination been established.

## DISCUSSION

The gravamen of the Plaintiff's complaint to the extent that any relief can be afforded by this Court, is that there is a disproportionate impact on black teachers and black students because of the School

Board's decision to close Carver Middle School and because of the employment practices of the Defendants. The Plaintiffs have basically asserted three interrelated theories upon which they seek relief: first, that the black students who live in the neighborhood surrounding Carver have a constitutional right to attend Carver Middle; and second, that due to the fact that historically Carver Middle School under segregation was a black school, the Plaintiffs have a property right to keep a historically black school open which is being denied without due process of law; and third, that the employment practices of the Defendants are creating a racially disproportionate impact on blacks.

The Court in considering the Plaintiff's first assertion of a right to attend a neighborhood school is cognizant of the fact that South Carolina law grants a child of school age the right to a free education but does not confer a right upon pupils to attend a specific school. In fact, South Carolina law gives the Board of Trustees exclusive authority to operate or not to operate any public school or schools. The Federal Court should not interpose and substitute its judgment and authority for that of local and state school authorities unless and until such actions by the Federal Court are clearly warranted to safeguard and protect rights guaranteed by the Constitution. *Bradford v. School District No. 20,* 244 F.Supp. 768 (D.S.C.1965), aff. 364 F.2d 185 (4th Cir.1966) The closing of Carver School is within constitutional guidelines. In actuality, it results in a more integrated school system for the entire district.

The Plaintiff's second assertion that the Plaintiffs have a property right to keep a historically black school open has not been supported by any legal authority. With respect to property right, the Supreme Court stated in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), that:

Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are de-

fined by existing rules or understandings that stem from an independent source such as State law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

The Plaintiffs have presented no independent source, either in the law of South Carolina, or otherwise, which has granted to them a legitimate claim of entitlement to attend a particular school because of historical significance. When faced with a factually similar case to the case at hand, the Federal District Court of Ohio in *Bronson v. Board of Educ. of City School District*, 550 F.Supp. 941 (S.D.Ohio 1982) stated:

> The school board which proposed to close predominately black elementary school in Cincinnati, Ohio, did not abuse its discretion, under Ohio statutory law, by the closing; because the board acted in response to an unanticipated fiscal crisis, and because the decision approved by the board conformed to all substantive requirements outlined in board policy, there did not appear to have been any abuse of discretion by the board. Ohio law does not grant the right to attend a particular school and since the Plaintiffs failed to assert a primary interest which was cognizable under state law they failed to satisfy the second element of a Section 1983 violation, i.e., that the conduct in question operated to deprive a person of rights secured by the constitution or laws of the United States.

Similarly, the Court of Appeals of the Second Circuit affirmed the decision of the Federal District Court in *Pride v. Community School Board of Brooklyn, N.Y. School Dist. No. 18*, 482 F.2d 257 (2d Cir. 1973) wherein the Court stated:

> District school board's assignment of black and other nonwhite children residing in public housing development to one school in the district rather than another was within the scope of board's discretion, notwithstanding that it resulted in a seven percent difference in black enrollment between the two schools affected,

where assignment was aimed at balancing sizes of first grade classes in district's schools.

The Plaintiffs do not dispute that when Carver Middle School was closed the student population was fifty (50%) percent black and fifty (50%) percent white; nor is it disputed that the schools where the students were transferred have black/white ratios of approximately fifty (50%) percent white and fifty (50%) percent black and that long distance bussing for both blacks and whites have been significantly reduced. Therefore, assuming for the sake of argument that a racially disproportionate impact exists, it must exist because of the closing of a school that has historical significance to the black community and not because black students are being treated differently than white students.

■ Assuming that closing a school which has a historical significance to the black community would constitute a disproportionate impact on blacks, proof of racially discriminatory intent or purpose is required to show an equal protection violation. Factors which a Court can consider in determining whether racially discriminatory intent or purpose was a motivating factor behind an official action or decision include the impact of the official action, the historical background of the decision, the specific sequence of events leading up to the decision, any procedural and substantive departures from the norm in connection with the decision or action, and the legislative or administrative history of the decision or action. *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Court has considered all of these elements and assuming that the Defendants' decision to close a historically black school in some way bore heavily on blacks the Plaintiffs have failed to prove that a discriminatory purpose was a motivating factor in the decision to close Carver Middle School and have thus failed to prove a Fourteenth Amendment violation. While considering the historical background of the decision to close Carver Middle School, the Court con-

sidered the Plaintiffs' allegations of discrimination in the Defendants' hiring, firing, and promotion practices. The Plaintiffs' testimony on this issue consisted mainly of testimony of persons who are not parties to this action. The Plaintiffs failed to show any evidence of intent to discriminate *de jure* or *de facto*. The Plaintiffs have further failed to shift the burden of proof to the Defendants because there has been no proof of either intentional segregative action or a recent history of racial discrimination in the school system. *Knighton v. Laurens Co. School Dist. No. 56,* 721 F.2d 976 (4th Cir.1983). Even if this burden of proof had been shifted, the Defendants have rebutted this presumption by clear and convincing evidence.

## CONCLUSIONS OF LAW

The Court, after careful consideration of all the evidence, reaches the following conclusions of law:

1. That this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. That the defendants have failed to establish a violation of either the equal protection clause of the Fourteenth Amendment to the United States Constitution or 42, *U.S.C.* § 2000d necessary to establish intentional discrimination, nor has any racial discriminatory intent or purpose been established from all the evidence in accordance with the mandate of *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

3. That the actions by the Defendants in closing Carver School, while acting within their official capacity, does not bear more heavily on one race than another. To the contrary, the impact resulted in an equal impact on both white and black students.

4. Plaintiffs have not established that they have a justiciable property right claim under South Carolina law or the mandates of *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

5. That pursuant to provisions of S.C. Code Ann. § 59–19–90 (1976), as amended, the authority to manage and control local educational institutions of this district and the sole and exclusive authority to operate any public school or schools within the district rests with the local school board, no statutory or property right is granted to anyone, regardless of race, to select the school which they will attend. This power of the local school board will not be disturbed unless in the exercise of their official duties such action rises to the level of a constitutional deprivation of rights under the equal protection clause of the Constitution or the Civil Rights Acts, as amended.

6. That in closing Carver School the Defendants acted in good faith, taking into consideration sound economic factors, adequate educational programs and the continued compliance with the legal requirements for an integrated school system.

7. That the closing of Carver School did in fact culminate in a continued integrated school system and a reduction in the distance students would be required to be transported, and further conformed with the long range plan of consolidation and improvement of educational facilities for all children.

8. That the closing of Carver School was based upon sound premises of educational and financial administration.

9. That the decline in the number of black teachers in the Abbeville School District was not the result of any racially discriminatory motive, intent or purpose.

10. Standing alone, the decrease in the number of black school teachers in the Abbeville School system from thirty-two percent (32%) in the 1972–73 school year to seventeen percent (17%) in the 1983–84 school year is meaningless. The Plaintiffs offered no credible proof that this reduction resulted from any discriminatory intent, purpose or official action.

11. The credible evidence reflects that there was no policy or pattern of conduct calculated to have a discriminatory impact, intent or purpose. Rather, other factors

such as salary, geographical location and a consistent decline in the number of black teachers in upper South Carolina provide a rational basis for this phenomenon. This Court would be blinding itself to reality if it did not recognize that private industry in this area holds greater attraction to a college educated black than the current pay scale in some of the rural school districts.

NOW, THEREFORE, based upon the foregoing, it is,

ORDERED, ADJUDGED AND DE-CREED that the relief requested in the Complaint is denied and the Complaint is hereby dismissed.

IT IS SO ORDERED.