**Haskell B. CARTER, Plaintiff,**

v.

**The OLIVER T. CARR COMPANY, Defendant.**

**Civ. A. No. 84–665.**

United States District Court, District of Columbia.

April 29, 1985.

Haskell B. Carter, pro se.

William J. Utermohlen, Richard A. Green, Washington, D.C., for defendant.

## MEMORANDUM

BARRINGTON D. PARKER, District Judge.

This case involves claims by the plaintiff, Haskell B. Carter, under Title VII of the Civil Rights Act of 1964 that the termination of his employment by the defendant, The Oliver T. Carr Company (Carr), was due to racial discrimination or to retaliation for Carter's having filed a charge with the Equal Employment Opportunity Commission (EEOC).[1]

Carr, among other things, provides management and security services for office buildings, most of which are located in downtown Washington, D.C. The security services are provided by a predominantly black force of security guards. Carter, a black, was hired as a security guard by Carr in 1979, serving in that capacity in Carr's Westbridge building until August

---

1. Carter also claimed religious discrimination based on his status as a non-Muslim, but this claim was dismissed by the court prior to trial.

1982. In that month, James P. Kennedy, Carr's Chief of Security, who is white, promoted Carter to the position of Roving Supervisor of the guard force. Carter replaced Steve Bush, a black. Carter was the second assistant supervisor, the other being Sultan Ali, who is black.

Kennedy was Carter's supervisor and the person who made the decision to terminate Carter's employment in September 1983 and it is primarily against Kennedy that Carter levels his charges of racial discrimination and retaliation. In the court's judgment, the case is essentially one of credibility of witnesses and the court finds that the overwhelming balance with respect to matters of credibility, as well as with respect to the evidence as a whole, favors Carr and Carr's witnesses.

Carter, who appeared *pro se*, made many allegations concerning Kennedy and Carr, but was unable to offer evidence providing a substantial basis for his complaint, which would have been difficult in any event, given the undisputed fact that Carter's replacement was Haleem Shakoor, who is also black. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Jones v. Public Defender Service,* 553 F.Supp. 1031, 1041 (D.D.C.), *aff'd,* 720 F.2d 215 (D.C.Cir.1983).

Carter alleged that Kennedy had directed racial epithets at him. While the court finds that Kennedy indeed had a proclivity for the use of profanity, the court places no credence in Carter's allegation of the use of racial epithets. Carter claimed that Kennedy's use of these epithets had been discussed by Carter and Herbert Behre, Kennedy's supervisor, but Behre did not recall such a discussion. Kennedy's disclaimer of the use of racial epithets is also supported by the fact that he could not have remained for five years an effective supervisor of the overwhelmingly black security force if he engaged in such a practice.

Carter also claimed that he was promised an opportunity to receive stock in the company and that stock and profit-sharing benefits are generally denied to the security guards. The testimony, however, failed to establish that any employees receive such benefits. Kennedy, in addition to denying having promised Carter stock benefits, stated that he did not participate in a stock-sharing plan and was not aware of the existence of such a plan. Behre's testimony was to the same effect.

The only matter that disturbs the court with respect to benefits given to employees is Carr's practice, which was recently altered, of excluding from the company picnic categories of employees that are predominantly black. Such a practice raises questions as to its propriety, but those questions are not relevant to this claim of discrimination as to a single individual.

Carr proffered several nondiscriminatory reasons for Carter's dismissal that were substantiated by the testimony at trial. One of Carter's principal duties was to be available, even when he was off duty, to assist with emergencies. To this end his home telephone number was distributed to the guards and he was required to carry a pager at all times. The weight of the evidence clearly establishes that Carter was not available in a manner consistent with his duties as Roving Supervisor. Several witnesses testified that Carter was often unavailable when they attempted to page him. In addition, he failed to inform Kennedy that he was no longer living at home and persons calling him at home were unable to reach him there for a several month period.

A related problem was the lack of cooperation that Carter exhibited toward both Kennedy and Ali. Kennedy testified that this was a pervasive problem reflected, for example, in Carter's failure to inform Kennedy or Ali of his obtaining a replacement guard to fill a vacant guard post, resulting in the procurement of two guards for the same post. His uncooperative attitude was also exhibited in his behavior toward Janet Stein, an Assistant Building Manager, who

asked Carter to help man a vacant guard post in August 1983. Carter refused to offer any assistance and gave her no explanation for his refusal.

Carter raised complaints concerning Sultan Ali's handling of his guard scheduling duties, claiming that Ali exhibited favoritism in his apportionment of overtime among the guards. Yet when Herbert Behre allowed Carter to assume those duties on a 30-day trial basis, Carter demonstrated favoritism in his selection that led to problems more severe than any that had existed before. Kennedy gave an excellent example of Carter's scheduling one guard in particular for excessive amounts of overtime, which led to the guard being found asleep at his post.

The evidence was very clear that Carter solicited guards to write letters concerning the evaluations they received in connection with the merit raise of July 1983 and that he engendered confusion and dissension among the guards by spreading false rumors concerning those pay raises. Such behavior was completely unwarranted and would alone have been sufficient reason for his termination.

Carter was given ample warning of the deficiencies in his performance in the evaluation given to him in July 1983, as well as on earlier occasions, but he chose to ignore these warnings. Kennedy even gave Carter the opportunity to return to his former position as a security guard at the increased salary he was receiving as a supervisor, but Carter was unwilling to make such an exchange of duties. In the court's view, Kennedy went the last mile in giving Carter an opportunity to avoid termination.

Carter was not represented by counsel, but was certainly competent to represent himself. By his own statements he is a college graduate and has taught school. The pleadings he has filed in this case evidence his ability to pursue his own interests as did his questioning on cross-examination. He knew what testimony he was

seeking, but was unable to elicit it from these witnesses. The court gave Carter wide latitude to develop any evidence favorable to his complaint and attempted to assist him with that effort, but persuasive evidence in Carter's favor has not been brought forward.

The court finds by the clear preponderance of the evidence, that there was no racial discrimination or retaliation with respect to Carter.[2] The complaint is accordingly dismissed with prejudice.

---

2. The court notes that the EEOC reached the same conclusion, although such a determination is not controlling here.