DEVELOPMENT BANK OF AMERICAN SAMOA, Plaintiff

v.

PALE ILALIO and TOA'I ILALIO, Defendants

High Court of American Samoa
Trial Division

CA No. 34-87

August 12, 1987

Before REES, Chief Justice, AFUOLA, Associate
Judge, and TUIAFONO, Associate Judge.

Counsel: For Plaintiff, Robert Dennison
 Pale Ilalio and Toa'i Ilalio pro se

On motion for new trial:

Plaintiff Development Bank sued Mr. and Mrs.
Ilalio for the balance due on a promissory note.
The Ilalios appeared _pro_ _se_. They said they had
signed a blank note which they had been given to
believe would be completed in an amount of about
$6000, not the $15,164 that was later filled in by
the Bank, and that they had agreed to sign the note
in exchange for the continued use of a truck which
was worth about $6000. The Bank later seized the
truck and sold it for $6000. We held that the
Ilalios did not owe the Bank any money. Plaintiff
moves for new trial on a variety of grounds.

### I. "Separate" Findings and Conclusions

Plaintiff begins by urging that there was "no
effective judgment" in this case because "[n]either
the Court's Opinion and Order nor the Clerk[']s
Entry of Judgement contain findings of fact and
conclusions of law stated separately as required by
Rule 52, T.C.R.C.P.. As a result, Plaintiff is
unable to ascertain what legal conclusion the
Judgement is based upon." (Emphasis in plaintiff's
motion.)

We believe that our opinion, which was divided
into sentences, paragraphs, and general areas of
discussion rather than into numbered and labeled
"findings" and "conclusions," nevertheless
contained findings of fact and conclusions of law
that were sufficiently "separate" to comply with
the rule. The opinion was written this way in the
hope that it would be more informative than an
opinion written by the numbers. We append,

-112-

however, a document in the form requested by plaintiff.

### II. Failure to "Enter a Take-Nothing Judgment"

As a further ground for its contention that there was "no effective judgment," plaintiff points out that "the Opinion and Judgement both purport to dismiss Plaintiff's action, as opposed to entering a take-nothing judgement."

In "purporting" to dismiss the action we were of course doing exactly what plaintiff's counsel refers to as "entering a take-nothing judgement." We suspect that counsel's objection was grounded not in any confusion on this point but in a desire to eliminate any lingering doubt we might have had about whether he liked our opinion.

Counsel has cited no authority for the proposition that "dismissal" is an inappropriate term for a denial of all the relief requested by the plaintiff after an adjudication on the merits, and we have been unable to find any. An argument might be grounded in Rule 41 of the Territorial Court Rules of Civil Procedure, which lists a number of circumstances under which actions may be dismissed and does not refer to dismissal after adjudication on the merits. The rule specifically provides, however, that "any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under 19 T.C.R.C.P., operates as an adjudication upon the merits." T.C.R.C.P. Rule 41(b). (This provision also disposes of counsel's suggestion, in response to a question from the Court at oral argument on this motion, that it is difficult to tell whether a dismissal is with or without prejudice.)

Whether to deny all relief after an adjudication on the merits by saying "the action is dismissed," "judgment is entered for the defendant," "the defendant takes nothing," or some other phrase seems to be a matter of style that varies from judge to judge, with one term or another possibly predominating in some regions or jurisdictions. In the first 400 pages of the most recent bound volume of the Federal Supplement, for instance, there are six cases in which the complaint or action was "dismissed" after plenary

-113-

adjudication of the merits.[1] The first few cases in the most recent volumes of American Samoa Reports and of American Samoa Reports (Second Series) also yield such instances.[2] Even if "entering a take-nothing judgment" were the preferred form, this sort of thing is not the stuff of which successful motions for new trial are made.

### III. Defective Pleadings

Plaintiff argues that the issues of fraud or mutual mistake, unconscionability, and accord and

---

[1]. Wharton v. Abbeville School Dist. No. 60, 608 F. Supp. 70, 73 (S.D. Cal. 1984) ("the Complaint is hereby dismissed" after trial on the merits); Lary v. United States, 608 F. Supp. 258, 263 (N.D. Ala. 1985) ("an order will be entered granting the defendant summary judgment and dismissing the case in its entirety"); Complaint of Tracy, 608 F. Supp. 263, 269 (D. Mass. 1985) ("the petition to limit liability is dismissed" after adjudication of the merits on motion for summary judgment); McGhan v. Ebersol, 608 F. Supp. 277, 288 (S.D.N.Y. 1985) ("The case is dismissed and the clerk is directed to enter judgment" on the merits after motion for summary judgment); Carter v. Oliver T. Carr Co., 608 F. Supp. 381, 383 (D.D.C. 1985) ("The complaint is accordingly dismissed with prejudice" after trial on the merits); Gibson v. Sullivan Trail Coal Co., 608 F. Supp. 390, 392 (D.V.I. 1985) ("Judgment will enter dismissing the complaint of the plaintiff" after summary judgment on the merits). The cited cases comprise six of the twelve cases in the 400 surveyed pages of the Federal Supplement in which the plaintiffs were denied all relief after an adjudication of the merits. Six of these cases were decided on motions for summary judgment and six after trial.

[2] See, e.g., Folasa v. Scanlan, 4 A.S.R. 194, 198 (1961) (per Morrow, C.J.) ("Accordingly, it is ORDERED that the plaintiff Folasa's petition be and the same is hereby dismissed" after trial on the merits); Tali v. Tupeona, 4 A.S.R. 199, 206 (1961) (per Morrow, C.J.) ("This petition must be dismissed."); Tumui v. Fa'alevao, 2 A.S.R.2d 33, 35 (1983) ("As to all other petitioners the matter is dismissed.").

satisfaction were "not tried" and furthermore that they "could [not] have been tried" because they were not "affirmatively pled" and furthermore were not "pled with particularity."

As in matters (1) and (2) above, we believe counsel would have us elevate form over substance. Moreover, the formal standards counsel believes we should have imposed on the pleading filed by this *pro* *se* defendant are stricter than those customarily observed by attorneys in this jurisdiction.

Unfortunately, the principle that a pleading must contain a succinct and informative statement of the party's claims or defenses is often honored in the breach. Pleadings too often deny things that the pleading party knows perfectly well to be true, deny "for lack of information" averments about which all the information to be had is in the possession of the party doing the denying, and recite conclusions of law rather than statements that put the opposing party on fair notice of how the pleader will try to get the Court to reach such conclusions. The Court has attempted in recent years to effect a gradual reformation of these and related practices. We have concentrated on devices by which judgments have been taken against people to whom notice was nonexistent rather than merely sketchy, but we have also freely granted motions to require the amendment of inadequate pleadings. Our efforts in this regard have met with a modest degree of success and with an even more modest degree of enthusiasm. Uninformative pleadings are still the rule rather than the exception.

In the High Court as in the federal courts, "pleadings shall be so construed as to do substantial justice." T.C.R.C.P. Rule 8(f). The practical effect of this overarching principle has been aptly stated by Professor Moore:

> Litigation is not an art in writing nice pleadings. . . . The pleading rules are designed to eliminate delay, and reduce the pleading requirement to a minimum. . . . "Loose pleading" is the cry of an alarmist who unconsciously would punish the client because of the latter's unfortunate choice of a lawyer who happens to be a poor pleader. The real importance of the Rules dealing with pleadings is that they make pleadings, in and of themselves, relatively unimpor-

-115-

tant. Cases are to be decided on the merits.

2A Moore's Federal Practice par. 8.02 at 8-9.

The principle of construction to do substantial justice has been held specifically to apply to the requirements of affirmative and particular pleading imposed by Rules 8(c) and 9(b) respectively. Trinity Carton Co. v. Falstaff Brewing Corp., 767 F.2d 184, 194 (5th Cir. 1985); Machado v. McGrath, 193 F.2d 706 (D.C. Cir. 1951), cert. denied, 342 U.S. 948 (1952).

The principle of construction to do justice is at its strongest when the pleading was drafted by a pro se litigant rather than by an attorney. Pro se pleadings should be construed to state a cause of action or a valid defense unless the Court "can say with assurance" that "it appears 'beyond doubt that the [litigant] can prove no set of facts in support of his claim which would entitle him to relief.'" Haines v. Kerner, 404 U.S. 519, 520-21 (1972), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Indeed, the very fact that "in the great run of pro se cases, the issues are faintly articulated and dimly perceived" imposes on the trier of fact

> a greater burden and a correlatively greater responsibility . . . to insure that constitutional deprivations are redressed and that justice is done. . . . Accordingly, the Court in considering the defendants' motion to dismiss will not permit technical pleading requirements to defeat the vindication of any constitutional rights which the plaintiff alleges, however inartfully, to have been infringed.

Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978), quoting Canty v. City of Richmond, 383 F. Supp. 1396 (E.D. Va. 1974), aff'd, 526 F.2d 587 (4th Cir. 1975), cert. denied, 423 U.S. 1062 (1976).

Although the reported cases tend to involve pro se plaintiffs rather than defendants, the principle that generates them seems even more compelling when someone who cannot afford a lawyer is called into court against his will. (Nor do we believe our duty to construe pleadings so as to avoid the inadvertent surrender of legal rights by

a pro se litigant is limited to cases in which the rights in question are grounded in the Constitution rather than in statutory or common law.)

In any case, the pleading to which plaintiff takes exception was if anything unusually informative for a pleading filed in the High Court. It is true that the defendants did not use the words fraud, mutual mistake, unconscionability, or accord and satisfaction. We doubt that the defendants know those words, and they had no obligation to use them. "Under Rule 8, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. It is not necessary to set out the legal theory on which the claim is based." Siegelman v. Cunard White Star, 221 F.2d 189 (2d Cir. 1955) (per Harlan, J.). Rather, defendants told the plaintiff and the Court that they had executed a promissory note "only on the value of the truck which was at that time about $6,000.00" and that "[i]n the year 1983, [plaintiff] Development Bank ceased the truck from us, and sold it to another client. So we assumed that the balance owed has been cleared." These statements put the plaintiff on fair notice (1) that the defendants denied making a contract in the amount of the note plaintiff planned to introduce as evidence; (2) that in the event the Court concluded they did sign such a note, the only value they received for it was a $6000 truck; and (3) that when the plaintiff took the truck back the defendants believed they were taking it in lieu of further payments. These three contentions--- which support, respectively, the legal conclusions called fraud or mutual mistake,[3] unconscionability,

---

[3] Contrary to the plaintiff's contentions, it is far from clear that the fraud or mutual mistake alleged in this case was an affirmative defense at all. If defendants had admitted to the contract as charged by plaintiff but demanded to be relieved from it on the ground that they were induced to contract by means of extrinsic fraud, it would be an affirmative defense. In this case defendants pled and proved that the contract alleged by the Bank never occurred. Rather, defendants had agreed to a different contract and plaintiff's agents had filled in the promissory note in the wrong amount. See Part IV infra. If a defense merely negates some element of the plaintiff's prima facie case, it need not be affirmatively pled.

and accord and satisfaction --- were the very ones defendants made and proved at trial.[4]

Moreover, the reason for the affirmative and particular pleading requirements is to avoid unfair surprise. Even if we were to hold that defendants had technically failed to comply with these requirements, we should deny a motion for new trial in the absence of some plausible basis on which to conclude that plaintiff was unfairly surprised or otherwise prejudiced by the assertion of affirmative defenses at trial. See Bull's Corner

Masuen v. E.L. Lien & Sons, Inc., 714 F.2d 55 (8th Cir. 1983).

[4] We are not sure whether the basis for plaintiff's argument that these defenses were not affirmatively pled is (a) that the names of the doctrines were not mentioned; (b) that the statements in the answer were not detailed enough to put plaintiff on notice that the defenses would be raised; or (c) that the defenses should have been pled in separate paragraphs and labeled "affirmative defenses." The first two contentions are dealt with in the text. As for the third contention, we think the "affirmativeness" requirement was met here by the statement of the facts giving rise to the defenses of fraud and unconscionability in a "Yes, but . . . . " format within a paragraph containing an admission. We have been unable to find any authority for the proposition that a separate paragraph is a sine qua non of the "affirmative pleading" requirement under the federal rule. In any case, we interpret our own Rule 8(c) to require only that affirmative defenses be affirmatively stated rather than subsumed in simple denials of the plaintiff's prima facie case. For instance, if defendants had answered plaintiff's allegation that they signed a $15,164 note with the word "Deny," they would not have complied with the rule. Instead they said, "Admit. But only on the value of the truck which was at the time about $6000." This indicated, although not artfully, the defense they planned to raise at trial. The statement of the facts giving rise to the defense of accord and satisfaction was in a separate paragraph at the conclusion of the numbered admissions and denials.

Restaurant, Inc., v. Director of Federal Emergency Management Agency, 759 F.2d 500 (5th Cir. 1985). The only basis alleged is that "plaintiff would show that it could have produced additional documentary evidence tending to disprove any defense of fraud or mistake." We requested at the oral argument on this motion, and then requested again in writing, that plaintiff submit any such evidence so that we could consider it in deciding whether to grant a new trial. None has been forthcoming.

Finally, any defects in the pleadings were mooted by the introduction at trial of evidence on the basis of which the Court found itself compelled to conclude that defendants never signed a note for the amount in question and that in any case the contract alleged by the plaintiff was unconscionable. Plaintiff's counsel did not object to the introduction of this evidence,[5] and

---

[5] At oral argument on this motion, counsel for the Bank suggested that he let the Ilalios tell their story to the Court in their own way because he believes that giving such an opportunity to pro se defendants gives rise to a desirable "catharsis": the defendants feel better about having to pay the amount demanded because the Court has listened to everything they have to say. We appreciate this sentiment, and we agree that a full and fair hearing may ease the pain of losing a case. One of the risks the Bank incurred when it opted to let the Ilalios have an unequivocal "day in court" rather than to raise technical objections at every turn, however, was that the Ilalios might win. In any case, we note that Mr. Ilalio was vigorously cross-examined by counsel for the Bank and also by the Court, and that none of the conclusions reached by the Court rested on evidence that was inconsistent with the pleadings or otherwise inadmissible. Although it is always conceivable that another trial might produce a different result, the Bank's contention that it did not really hold the Ilalios' feet to the fire at the first trial is insufficient to justify the expense and inconvenience of a second proceeding. This is particularly true in a case in which the party seeking a new trial has full-time "in-house" counsel at its disposal whereas the parties who prevailed at the first trial cannot afford

introduced much of the evidence for the holding of unconscionability[6] himself.

> "The legal rights of the [parties] are to be determined by the law and the facts of the case and not by some language of the claim." . . . "[P]articular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not.". . . The fact that a [party] may have erred in his choice of legal theory will not preclude him from obtaining relief under another legal theory.

2A Moore's Federal Practice par. 8.14 at 8-86, quoting Kowalewski v. Pennsylvania R.R. Co., 141 F. Supp. 565, 569 (D. Del. 1956) and Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 976 (2d Cir. 1945) (per Clark, J.). The alternative proposition --- that a court, having listened to the evidence adduced by both sides at trial and concluded on the basis of that evidence that a contract never occurred or was otherwise legally unenforceable, should enforce it anyway --- was the sort of thing Mr. Bumble had in mind when he observed that "the law is a ass, a idiot." In the present case it would tend to validate the portrayal of courts in a "bourgeois" society as operating primarily to increase the leverage that the powerful enjoy over the powerless.

---

a lawyer.

[6] Plaintiff's evidence as well as defendant's supported the conclusion that the only consideration received by the defendants for the $15,000 note was the conditional use of a $6,000 truck. This evidence was, incidentally, at variance with plaintiff's pleading, which alleged that the consideration was "the loan of DBAS funds for the purchase of a vehicle." We point this out not to criticize counsel for plaintiff, whose pleadings are generally accurate and informative, but to underscore the inappropriateness of enforcing a hyperstrict construction of the rules of pleading against Mr. and Mrs. Ilalio.

## IV. Fraud or Mutual Mistake

Plaintiff also contends that "there was no evidence, or insufficient evidence, to support a finding of fraud or mistake."

Defendants' principal contention at trial was that they had signed papers which were blank or nearly blank, and which they understood would be completed in an amount of about $6000. All three judges examined the documents and found them consistent with this testimony. We found Mr. Ilalio to be a credible witness, and we also took judicial notice of the fact that the Bank officers with whom the Ilalios dealt were later convicted of various fraud-related crimes whose details were quite similar to those alleged by the Ilalios in this case. The Bank did not offer any testimonial evidence to rebut the defendants' version of these events. Accordingly, the preponderance of the evidence supports the defendants' contention. In our original opinion we called this contention "fraud" (if the Bank officials knew of the Ilalios' understanding and nevertheless filled out the contract in a different amount) or "mutual mistake" (if the Bank officials were unaware of the Ilalios' understanding). Another way to say the same thing is that there was no agreement between the parties on an essential term of the contract and therefore there was no contract. The plaintiff was entitled to the return of what it gave the defendants; this it has received.

## V. Unconscionability

We also held that the contract alleged by the Bank was unconscionable; it was a contract "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other," and was therefore not enforceable in a court of law and equity. Plaintiff urges that this holding was in error.

Plaintiff seems to argue that in order for a contract to be legally unenforceable under the doctrine of unconscionability it is necessary to find both "failure of consideration" and a complete lack of "voluntariness" such as would be necessary to support a defense of duress. On the contrary, if either or both of these findings were necessary to the conclusion that a contract was unconscionable the doctrine of unconscionability would have no separate existence. See, however, Restatement of Contracts 2d § 208 (1981), quoted in

-121-

footnote 2 of our original opinion. <u>See also</u> <u>Lampley v. Pertuit</u>, 199 So. 2d 452, 454 (Miss. 1967), quoting <u>Bethea v. Mullins</u>, 85 So. 2d 452, 456 (1956) and 16 Am. Jur. Deeds § 33:

> "[I]f the inadequacy of consideration is so glaring as to stamp the transaction with fraud and to shock the common sense of honesty, a court of equity will intervene. If the consideration is grossly inadequate, equity in any case will lay hold of slight circumstances of oppression, fraud, or duress in order to rescind the conveyance."

In the present case there was some consideration for the note the Bank says the Ilalios signed, but it was so grossly inadequate as to raise serious questions about the bargaining process.[7] And the Ilalios, as plaintiff points out, were legally and physically free "to refrain

---

[7] In its memorandum in support of the motion for new trial plaintiff argues that the consideration for the Ilalios' $15,000 debt was more than just the use of a $6000 truck. Plaintiff argues that the Bank forbore from suing Mr. Ilalio's half-brother; that the Ilalios' situation was therefore "analogous to the situation of a co-maker or co-signer"; and that "we do not know what consideration, other than the use of the truck," defendants "may have received from the relative."

This argument is contrary to the evidence. The Ilalios asserted in their pleadings and at trial that their only reason for signing anything and the only thing they received was the continued use of the truck; the Bank introduced no evidence of a promise to forbear or of any discussion of forbearance against the half-brother, much less of the hypothetical "other consideration" of which "we do not know." The evidence is overwhelming that the Ilalios contracted with the Bank only because of the Bank officials' threats to "sell" the truck to "another customer" and that concern for the image and credit rating of the absent and judgment-proof half-brother was not a factor that was ever mentioned or considered by either side. The Ilalios were not, therefore, analogous to co-signors; rather, the Bank officials were analogous to used car salesmen.

from contracting at all," just as the people in other unconscionability cases were free not to buy refrigerators, stereos, or dance lessons. There was no "legal duress" in those cases or in this one. The evidence, however, is replete with indicia of unequal bargaining power, sharp practice, and the absence of any real bargaining process. If the Ilalios had signed a $15,164 note at all (which we believe they did not) the transaction would have presented a classic case of unconscionability as defined by the cases and other authorities cited in our original opinion.

## VI. The Seizure and Sale of the Truck

The plaintiff also urges that we erred in observing that if the truck had been worth $15,000 plaintiff probably would not have had the legal right to seize it without judicial foreclosure, sell it for $6000 in an unadvertised private sale without notice to the defendants, and then proceed against them for the remaining $9000 plus several thousands of dollars in interest, costs, and attorney fees. Although we believe this to be a correct statement of the law, we refrain from reiterating our reasons. The statement was obiter dictum. It was made in the hope of administering, in advance of any litigation in which the issue is unavoidable, what plaintiff characterizes as a "rude surprise" to anyone who might be planning such a transaction. (We did err in stating that the sample mortgage form contains no provision to the effect that the Bank may repossess without judicial foreclosure. It does contain such a provision.)

## VII. The Subsequent "Agreement"

Finally, plaintiff urges that we erred in finding that there was no consideration for the "agreement" signed by Mr. Ilalio in 1986, by which he undertook "in consideration of the creditor's forbearance from suit on the promissory note" to pay the amount due on the note and to "waive all defenses of the statute of limitations and other waiveable defenses" in the event of a lawsuit.

We agree with plaintiff that there are circumstances in which forbearance to press an invalid claim can be consideration for a new agreement. Our statement that "[i]n fact . . . there was no consideration for this 'agreement' and it was therefore not legally binding on the

-123-

Ilalios" was too broad in its implications if not in its application to the facts of this case.

Forbearance from pressing a claim that is later found to be invalid can be consideration for a new promise provided that, at the time the new promise is made, the forbearing party believes in good faith that his claim is just. Restatement of Contracts 2d § 74; Corbin on Contracts § 140. This does not mean, however, that courts are bound to accept and enforce at face value every piece of paper declaring itself to be a settlement. On the contrary, such documents are customarily given somewhat stricter judicial scrutiny than contracts involving more palpable consideration.[8]

Such scrutiny is especially appropriate when the invalidity of the initial "agreement" was due to gross inadequacy of consideration, inequality of bargaining power and sophistication, and circumstances which are not technically fraud and duress but somewhat resemble them to the naked eye. If the law gave a person or institution in possession of such a document the absolute power to dissociate it from the shameful circumstances of its birth simply by calling the "debtor" in, showing him his signature on the document, and getting him to sign another one just like it under threat of immediate legal proceedings, we would not need courts. Collection agencies would do.

We are not suggesting that the new management of the Bank operates as the old one did, or that any individual Bank officer had reason to know the circumstances under which the Ilalios signed the first document. (Indeed, from plaintiff's pleading it appears that the new management of the Bank may have believed until shortly before the trial of this case that Mr. and Mrs. Ilalio actually received the $15,164 which is the stated consideration for the promissory note.) The plaintiff in this case, however, is not any particular officer but the Bank itself. When the Bank concluded the "settlement" in 1986 it was chargeable with the knowledge and with the actions of its agents who dealt with the Ilalios in 1982.

---

[8] See Corbin on Contracts § 140 and cases cited therein. Many of the cases in which courts have held settlements unenforceable concern accident victims who release tortfeasors or insurance companies from all liability in exchange for relatively

small sums of money. The most common rationale is that the parties were mutually mistaken about the extent of the victim's injuries; it is clear, however, that many of the cases have more to do with whether "the agreement was fairly and knowingly made." Farrington v. Harlem Savings Bank, 19 N.E.2d 657, 657 (N.Y. 1939). See also Mangini v. McClurg, 249 N.E.2d 386, 392 (N.Y. 1969) ("The requirement of an 'agreement fairly and knowingly made' has been extended . . . to cover other situations [i.e., cases where there was no actual fraud] where because the releasor has had little time for investigation or deliberation, or because of the existence of overreaching or unfair circumstances, it was deemed inequitable to allow the release to serve as a bar to the claim of the injured party."); Perdikouris v. The S/S Olympos, 185 F. Supp. 140 (S.D.N.Y. 1960) ("[C]onsidering the inadequacy of the consideration, the mistaken belief that libellant [an injured seaman] was cured, the circumstances surrounding the legal advice made available to libellant [a brief consultation with an attorney friendly to the shipowner], and libellant's lack of full understanding of his rights, we reach the conclusion that respondent's plea of accord and satisfaction must be overruled [and] the release set aside . . . .").

The principles at work in the personal injury release cases apply with equal force to the present case. In both situations (1) the party that drafted and pressed for the "settlement" is a business entity experienced in and familiar with such transactions; (2) the other party is an individual who has no such experience or familiarity and who generally signs the document without benefit of legal counsel; (3) the transaction was a whirlwind settlement in which there was no evidence that the weaker party negotiated, deliberated, or fully understood what he was giving up, and in which the stronger party employed threats or promises (usually threats or promises to do things that the stronger party had a legal right to do) to encourage a quick decision; and (4) the exchange was lopsided, consisting of the surrender of potentially valuable legal rights by the weaker party in exchange for a small sum or other trivial consideration from the stronger party.

-125-

It therefore cannot be said to have believed in good faith that the Ilalios owed it $13,000. Such good faith is essential for forbearance on an invalid claim to constitute consideration. _See generally_ Corbin on Contracts § 140.[9] The 1986 agreement therefore lacked consideration.

Even if the Bank were held to be in good faith (as we hold it was not) with regard to the validity of its original claim, forbearance to sue on it would not fix everything that was wrong with it. This is true for several reasons.

First, although the new management of the Bank has not engaged in the sorts of practices the old management did, the second transaction cannot fairly be described as one in which two parties

---

[9] Although courts have varied widely in their analyses of the reasons for the good faith requirement, they tend to focus not on whether the forbearing party "believe[s] his suit can be won" but on whether he has a reasonable belief "that it is just to try to enforce his claim." Corbin on Contracts § 140 at 601-02. This is true despite the fact that there may be some benefit to the alleged debtor and some detriment to the supposed creditor even in forbearance on an obviously unjust claim. The rule that forbearance on such a claim cannot be consideration is imposed "on grounds of public policy. . . . [I]f it were recognized as sufficient, ill-founded claims would be infinitely increased in number and the offense that is known as blackmail would become a profitable racket." _Id_. at 597-98.

In this case the Bank officials who presented Mr. Ilalio with the 1986 "agreement" probably believed they had a good chance to prevail on their claim. They might have concluded this even if they had known (as the Bank itself must be held to have known) all the facts about the original transaction; equitable defenses often depend on the discretion of the trial judge. This means only that the Bank might reasonably have believed its claim to be unjust but winnable. For the practical reason given by Corbin, and for the related reason that many judges regard blackmail enforcement as bad for their image and for their insomnia, forbearance to press such a claim cannot serve as consideration.

-126-

worked out a "settlement" of their differences at arm's length. The 1986 document was a contract of adhesion offered on a take-it-or-leave-it basis by one of the most powerful economic institutions in the Territory to a party who was far poorer and far less sophisticated than the drafting party and who was unrepresented by counsel. Although he was physically free (just as he was in 1982) "to refrain from contracting at all," the Bank threatened him with an immediate lawsuit if he did not sign. It is unfortunately the case that such a threat will often induce people, particularly poor people and people in American Samoa, to sign just about anything. When it presented Mr. Ilalio with the 1986 document the Bank knew or should have known that Mr. Ilalio would probably be far more afraid of a lawsuit than he had any good reason to be (than, for instance, the Bank itself would have been if Mr. Ilalio had been threatening to sue it on a questionable claim) and that whether he signed would have more to do with this fear than with any estimate of the validity of his defenses.[10]

---

[10] At trial Mr. Ilalio was questioned sharply by the author of this opinion about why he signed the "agreement" if he did not in fact believe he owed the Bank any money. After listening to Mr. Ilalio's answers, observing his demeanor, and discussing the matter with the two Samoan Associate Judges who sat on the case, however, the author came to the conclusion that the "agreement" had more to do with the factors discussed in the text than with anything Mr. Ilalio believed, intended, or bargained for with respect to the Bank's original claim against him.

Courts and commentators in the United States have long remarked the ease with which people can be induced to sign adhesion contracts containing the most draconian kinds of provisions, including waivers of important substantive and procedural rights in the event of litigation. This phenomenon is particularly pronounced among people in the lower economic strata; indeed, it is the phenomenon that gave rise to the doctrine of unconscionability and other mitigating devices. It is particularly strong in this Territory.

In the Samoan culture it is considered somewhat impolite to refuse almost any request, including a request to give away large amounts of money or other property.

Another reason the 1986 "agreement" should not constitute a bar to Mr. Ilalio's assertion of his defenses to the original promissory note is that it did not clearly purport to do so. Rather, the 1986 document was itself vague and ambiguous on what the defendants' rights would be in the event the parties eventually faced each other in litigation. It provides that in the event of such litigation Mr. Ilalio "shall waive all defenses of the statute of limitations and other waiveable defenses." This clearly implies the preservation of his right to assert other, "non-waiveable" defenses.

What might these be? At the very least they would seem to include defenses which, although they may be reconcilable with the classical premises of contract law, exist at least partly to protect the general public or the integrity of the legal system. The clearest example of such a non-waiveable defense is illegality. We would be inclined to put fraud and unconscionability on the list as well, but we need not reach those legal questions in order to construe the "waiveable defenses" clause in the 1986 "agreement." If it is not clear to the Court that fraud and unconscionability are "waiveable," it certainly would not have been clear to a reasonable person in the position of Mr. Ilalio. Vague and ambiguous

---

Avoidance of immediate conflict, with the possibility that real agreement can be reached at some time in the future, is greatly preferred to a direct refusal. This is especially true when a request is made by someone with a claim to superior social status or to official authority.

A related phenomenon is an unusually strong desire to avoid courts, which are authoritative and powerful yet mysterious, untraditional, and somewhat foreign. A threatened lawsuit therefore has a far more vivid _ad_ _terrorem_ effect on a person of limited means and sophistication in Samoa than it would have on the reasonable person in New York. It is inconceivable that an institution doing business in the Territory could remain unaware of this for very long, and the High Court cannot ignore it either.

language is to be construed against the drafter. Moreover, the phrase "the statute of limitations and other waiveable defenses" clearly connotes "the statute of limitations and other defenses like it," that is, technical barriers to the enforcement of an otherwise just debt. Accordingly, by the best reading of the "agreement" itself Mr. Ilalio preserved his right to assert substantive defenses to the validity of the original contract. (Mrs. Ilalio, who did not sign the 1986 document, has not waived any defenses.).

Yet another reason that the 1986 transaction should not be held to have accomplished everything the Bank would like it to accomplish is that the Bank gave up very, very little. There was not one penny's worth of compromise on the substance of the claim. There was no delay in foreclosing any security interest --- the truck, it will be recalled, already having been taken. And a judgment against a poor person in American Samoa is worth very little in and of itself. It does not give rise to a power to seize the debtor's real property unless it is secured by a specific mortgage on such property. A.S.C.A. § 43.1528. With regard to personal property and future income, the judgment debtor has a legal right to an order allowing him to retain whatever is necessary to support himself and his dependents and also to comply with customary obligations (often quite extensive and burdensome) to his extended family. A.S.C.A. § 43.1501. As a practical matter this exempts just about everything. The $200 per month that the Bank was to receive under the agreement (and did receive for several months) was almost certainly higher than what it would have received if it had secured a judgment and tried to execute it. The agreement was, in other words, a far better deal for the Bank than for the Ilalios even if we do not extend it beyond its most obvious meaning to include a waiver of the defenses of fraud and unconscionability. This was true, moreover, for legal and practical reasons that were well known to the Bank and almost certainly not known to the Ilalios.

All this is not to say that signatures on documents never mean anything, but only that they do not always mean everything. If the 1982 transaction had been above board and the Bank were using the 1986 agreement for the purpose for which it seems to have been designed --- to toll the statute of limitations --- its forbearance from suit would be valid consideration for Mr. Ilalio's

-129-

agreement to waive the statute. The Bank's palpably detrimental reliance on his explicit agreement to waive the statute would overwhelm the equitable arguments against enforcement.[11] The document is not, however, a complete substitute for all the missing substantive elements --- a meeting of the minds or some objective manifestation thereof, considerations that were even arguably equivalent, parties of roughly comparable bargaining power and sophistication, and a bargaining process untainted by sharp practice--- in the absence of which the original transaction did not give rise to a binding contract or a just debt.

## VIII. Due Process

The Bank argues that our original holding was in derogation of its right to due process of law. Since we believe the holding to have been in accordance with law and with the evidence and pleadings in the case, we conclude that it did not deprive the Bank of due process.

## Order

The motion for new trial is denied.

---

[11] This would be true as a matter of common law and equity even in the absence of the territorial statute explicitly providing that causes of action founded in contract are revived by signed admissions. See A.S.C.A. § 43.0128. This statute has no bearing on the present case. It provides only that a subsequent acknowledgement can "revive" an obligation that was formerly binding but has lapsed for some reason. It is fully consistent with our holding that an acknowledgment does not create (in the absence of non-trivial consideration and/or a process of genuine bargaining) a valid contract where there was none to "revive."